527 P.2d 1222

**Allen JIM, Plaintiff-Appellant,**

v.

**CIT FINANCIAL SERVICES CORPORATION, Defendant-Appellee.**

**No. 1138.**

Court of Appeals of New Mexico.

Oct. 2, 1974.

Certiorari Granted Nov. 5, 1974.

Lopez, J., concurred specially and filed opinion.

Hernandez, J., dissented and filed opinion.

Richard W. Hughes, Shiprock, for plaintiff-appellant.

R. Thomas Dailey, Tansey, Rosebrough, Roberts & Gerding, P. C., Farmington, for defendant-appellee.

OPINION

HENDLEY, Judge.

Defendant's motion to dismiss was granted for failure to state a claim upon which relief can be granted and plaintiff appeals. In so ruling on defendant's motion the trial court accepted all factual matters of the complaint as true.

The complaint is as follows: Plaintiff is an enrolled member of the Navajo Nation residing on the Navajo Reservation in San Juan County, New Mexico. Plaintiff purchased a pickup truck in Farmington, New Mexico and defendant financed the sale. Subsequently, plaintiff was declared in default on the payments of the loan on the pickup truck. Two agents or employees of defendant came upon the Navajo Reservation and without the consent or permission of plaintiff removed the pickup truck. Defendant filed no replevin or other similar action in the Navajo Tribal Court prior to the repossession and no order of the Tribal Court was ever served on plaintiff before or after the taking of the pickup truck.

The complaint also set forth the following sections of the Navajo Tribal Code which had been approved by the Secretary of the Interior through his designees:

Title 7

"§ 307. Repossession personal property

"The personal property of Navajo Indians shall not be taken from land subject to the jurisdiction of the Navajo Tribe under the procedures of repossession except in strict compliance with the following:

"(a) Written consent to remove the property from land subject to the jurisdiction of the Navajo Tribe shall be secured from the purchaser at the time repossession is sought. The written consent shall be retained by the creditor and exhibited to the Navajo Tribe upon proper demand.

"(b) Where the Navajo refuses to sign said written consent to permit removal of the property from land subject to the jurisdiction of the Navajo Tribe, the

property shall be removed only by order of a Tribal Court of the Navajo Tribe in an appropriate legal proceeding."

Title 7

"§ 309.   Civil liability

"Any person who violates section 307 of this title and any business whose employee violates such section is deemed to have breached the peace of the lands under the jurisdiction of the Navajo Tribe, and shall be civilly liable to the purchaser for any loss caused by the failure to comply with sections 307–309 of this title.

"If the personal property repossessed is consumer goods (to wit: goods used or bought for use primarily for personal, family or household purposes), the purchaser has the right to recover in any event an amount not less than the credit service charge plus ten percent (10%) of the principal amount of the debt or the time price differential plus ten percent (10%) of the cash price.

"Purchaser means the person who owes payment or other performance of an obligation secured by personal property, whether or not the purchaser owns or has rights in the personal property."

The complaint further alleged a violation of section 307 and sought damage by the terms of section 309. The complaint only asked for relief on the basis that the enactments were entitled to full faith and credit. The conflict of laws question argued on appeal was not raised in the trial court. Accordingly, we do not discuss that question. We need go no further than McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed. 2d 129 (1973) which held that a state may not impose a tax on resident Navajo Indians based on income arising out of and on the Navajo Reservation. The reasoning being that the imposition of the tax had interfered with matters which the relevant treaty and statutes leave to the exclusive province of the Federal government and the Indians. McClanahan espoused principles which are dispositive of the present question. The McClanahan court stated:

"The Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read. It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government. Indians today are American citizens. They have the right to vote, to use state courts, and they receive some state services. But it is nonetheless still true, as it was in the last century, that '[t]he relation of the Indian tribes living within the borders of the United States * * * [is] an anomalous one and of a complex character. * * * They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; *not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.'* United States v. Kagama, 118 U.S. 375, at 381–382, 6 S. Ct. 1109, at 1112, 30 L.Ed. 228 (1886)." (Emphasis added, footnotes omitted)

Previously Congress expressed its willingness to have any state assume jurisdiction over reservation Indians provided the state could affirmatively accept such a responsibility. 67 Stat. 588, Ch. 505, § 7 (1953), repeal by Title IV, 82 Stat. 79, § 403(b) (1968). New Mexico did not accept this offer of jurisdiction.

Accordingly, as long as the Indian Tribes have preserved their tribal relations, as has the Navajo Tribe, they are "' * * * regarded as having a semi-independent position * * * as a separate people, with the power of regulating their internal and social relations, and thus far

not brought under the laws of the Union or of the State within whose limits they resided.'" McClanahan v. State Tax Commission of Arizona, supra. The natural extension of this concept is that all who come upon the Navajo Reservation are subject to the tribal laws.

What is the status of Indian Tribal Law when pursued in a State Court of New Mexico?

■ Plaintiff contends that the law is entitled to full faith and credit. U.S. Const., art. 4, § 1. He contends that Congress expanded the full faith and credit clause by enacting 28 U.S.C.A. § 1738 which states in part:

"The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof * * * shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."

Plaintiff does not contend that the Navajo Nation is a State or possession within the meaning of the statute. He asserts it is a territory, citing Mackey v. Coxe, 59 U.S. (18 How.) 100, 15 L.Ed. 299 (1855). That case does not control; it interpreted an entirely different statute. We believe the emphasized wording in the above quote from *McClanahan* indicates that Indian Nations are indeed not territories.

■ Further, we think the language in District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), rehearing den., 410 U.S. 959, 93 S.Ct. 1411, 35 L.Ed.2d 694 (1973) is appropriate:

" * * * The territorial state has aptly been described as 'one of pupilage at best.' Nelson v. United States, 30 F. 112, 115 (Or.1887). From the moment of their creation, the Territories were destined for admission as States into the Union, and 'as a preliminary step toward that foreordained end—to tide over the period of ineligibility—Congress, from

time to time, created territorial governments, the existence of which was necessarily limited to the period of pupilage.' O'Donoghue v. United States, 289 U.S. 516, 537, 53 S.Ct. 740, 745, 77 L.Ed. 1356 (1933) ; see McAllister v. United States, 141 U.S. 174, 188, 11 S.Ct. 949, 954, 35 L.Ed. 693 (1891). Thus, in light of the transitory nature of the territorial condition, Congress could reasonably treat the Territories as inchoate States, quite similar in many respects to the States themselves, to whose status they would inevitably ascend."

New Mexico need not give full faith and credit to the Navajo Tribal Code.

■ Although not directly raised, mention of the law of comity was made at oral argument. That doctrine applies to relations between sovereign states. The Navajos, although "semi-independent," are not sovereign. *McClanahan,* supra.

Affirmed.

It is so ordered.

LOPEZ, J., specially concurs.

HERNANDEZ, J., dissents.

LOPEZ, Judge (specially concurring).

I concur in the result only. This appeal is based only upon the issue of dismissal for failure to state a claim upon which relief can be granted by the courts of this state. The issue on review is whether the plaintiff would be entitled to recover under any state of facts provable under the claim that is made. Tapia v. McKenzie, 83 N.M. 116, 489 P.2d 181 (Ct.App.1971). Section 309, Title 7, of the Navajo Tribal Code is similar to § 50A–9–507(1), N.M.S.A.1953 (Repl.Vol. 8, pt. 1), a statute under which relief could be granted for wrongful repossession. Were I asked to decide this case under § 50A–9–507(1), supra, I might rule quite differently.

The purpose of the letter section is merely to afford an appropriate remedy to an individual for wrongful repossession under the U.C.C., Uniform Commercial

Code (U.L.A.) § 9–507, Official Comment (1968). The purpose of the former section is to preserve peace in Navajo lands and jurisdiction of the Navajo tribal courts over internal matters. 7 N.T.C. § 309, History (1970).

Essentially, 7 N.T.C. § 309 is "a punishment of an offense against the public, or a grant of a civil right to a private person." Huntington v. Attrill, 146 U.S. 657, 13 S. Ct. 224, 36 L.Ed. 1123 (1892); McGrath v. Tobin, 81 R.I. 415, 103 A.2d 795 (1954). As such, the Navajo statute is penal in nature and should not be enforced in this state. The Antelope, 10 Wheat. 66, 6 L. Ed. 268 (1825). See also Stiff v. Fogerson, 58 N.M. 193, 269 P.2d 743 (1954).

Since the foreign statute under which relief is sought is essentially penal, I agree with the court below that this action fails to state a claim upon which relief can be granted.

HERNANDEZ, Judge (dissenting).

I respectfully dissent. However, before discussing my disagreement with the majority opinion, I would like to reiterate appellant's points on appeal as they are set forth in the briefs: (1) that under a modern choice of law analysis, the law of the jurisdiction in which collateral is located must govern the manner of repossession; (2) that the Navajo Tribe is a sovereign nation having the power to regulate the conduct of all persons within its jurisdiction; (3) that enactment of Sections 307 and 309 of the Navajo Tribal Code by the tribal council constitutes a legitimate exercise of federally recognized tribal sovereignty in the Navajo Tribe; and (4) that this court should accord full faith and credit to these sections of the Navajo Tribal Code.

I would, also, like to set forth appellee's arguments against these points: (a) that conflicts of laws principles are not applicable because this case involves enactments of the Navajo Tribal Council rather than statutes of another state; (b) that the provisions of the Navajo Code sought to be enforced here are penal in nature and that courts of one jurisdiction will not enforce the penal statutes of another jurisdiction; and (c) that Navajo Tribal Courts have no jurisdiction over non-Indian defendants and cannot enforce their laws against non-Indians.

SOVEREIGNTY

Because the nature and scope of Indian tribal sovereignty pervades all of the issues in this case, it must of necessity be dealt with first. Early judicial recognition of the inherent sovereignty of the Indian tribes may be found in Chief Justice Marshall's opinion in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832):

"A weak state, in order to provide for its safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state. * * *"

This inherent Indian tribal sovereignty is qualified by acts of the Federal Government. It is coterminous or shared vis a vis the states in which the reservations are situated. However, any state action that infringes on the Indian's right of self-government within the exterior boundaries of a given reservation is invalid. In Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed. 2d 251 (1959), the Supreme Court said:

"Over the years this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy of *Worcester* has remained. * * * Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."

Felix Cohen in his Handbook of Federal Indian Law states:

"There is nothing to justify an alternative to the conclusion that the Indian tribes retain sovereignty and jurisdiction over a vast area of ordinary offenses

over which the Federal Government has never presumed to legislate and over which the state governments have not the authority to legislate." at 148.

## TERRITORIAL STATUS

My most serious disagreement with the majority opinion is its conclusion that Section 1738, supra, does not apply to acts of the Navajo Tribal Council or orders of the Navajo Tribal Courts. Section 1738, supra, in its entirety reads as follows:

"The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

"The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

"Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."

The Supreme Court, speaking of the territorial characteristics of the Cherokee Indians in Mackey v. Coxe, 59 U.S. 100, 15 L.Ed. 299 (1885) stated:

"The Cherokees are governed by their own laws. * * * By the national council their laws are enacted, approved by their executive, and carried into effect through an organized judiciary.

\*    \*    \*    \*    \*    \*

"This organization is not only under the sanction of the general government, but it guarantees their independence, subject to the restriction that their laws shall be consistent with the constitution of the United States, and acts of congress which regulate trade and intercourse with the Indians.

\*    \*    \*    \*,    \*    \*

"A question has been suggested whether the Cherokee people should be considered or treated as a foreign state or territory. The fact that they are under the constitution of the Union, and subject to acts of congress regulating trade, is a sufficient answer to the suggestion. They are not only within our jurisdiction, but the faith of the nation is pledged for their protection. In some respects they bear the same relation to the federal government as a territory did in its second grade of government, under the ordinance of 1787. Such territory passed its own laws, subject to the approval of congress, and its inhabitants were subject to the constitution and acts of congress. The principal difference consists in the fact that the Cherokees enact their own laws, under the restriction stated, appoint their own officers, and pay their own expenses. This, however, is no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union. It is not a foreign, but a domestic territory, —a territory which originated under our constitution and laws."

Although the court was speaking with reference to a specific enactment, I believe that this language, nonetheless, has general application.

On this question the court in Americana of Puerto Rico, Inc. v. Kaplus, 368 F.2d 431 (3rd Cir. 1966), was confronted with whether Section 1738 applied to the Commonwealth of Puerto Rico. In deciding that it did apply the court reasoned as follows:

"[T]he term 'Territories' has been considered susceptible of interpretation— that is, *it does not have a fixed and*

*technical meaning that must be accorded to it in all circumstances."* [Emphasis mine].

I believe that the use of the term "territory" in Section 1738, supra, is broad enough to include the Navajo Indian Tribe.

\*　\*　\*　\*　\*　\*

"The extension of full faith and credit by Section 1738 to the territories has met with the approval of the Supreme Court. [Citations omitted].

"The basic goal of full faith and credit is to coordinate the administration of justice throughout the nation. In order to achieve this goal Congress enacted Section 1738 \* \* \*." *Americana of Puerto Rico, Inc. v. Kaplus, supra.*

## FULL FAITH AND CREDIT

I believe that the status or legal character of the Navajo Tribe is analogous to that of the Commonwealth of Puerto Rico. The inhabitants of both are citizens of the United States; both have the power of self-government. They each have the power to decide upon the number and branches of government, the extent of the powers of each branch, and the method of election and duration of terms of office of the members of each branch. "The government of the Commonwealth derives its powers not alone from the consent of Congress, but also from the consent of the people of Puerto Rico." *Americana of Puerto Rico, Inc. v. Kaplus, supra.* The Navajo Tribe has the exclusive right of self-government over its internal affairs. Navajo Treaty of 1868 (15 Stats. 667); *Williams v. Lee, supra.* This exclusive right of self-government is subject only to express acts of Congress and state actions which do not infringe upon their right of self-government. See *Littel v. Nakai,* 344 F.2d 486 (9th Cir. 1965).

The majority's strong reliance on *Mc-Clanahan* as authority for the conclusion that "Indian Nations are indeed not territories" is misplaced. To the contrary, the *McClanahan* court, itself, said: " \* \* \* this case involves the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation." In reaching the conclusion that Arizona had no authority to impose its tax, the court also had this to say regarding Indian sovereignty:

"The principles governing the resolution of this question are not new. On the contrary, '[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.' *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945). This policy was first articulated by this Court 141 years ago when Mr. Chief Justice Marshall held that Indian nations were 'distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guaranteed by the United States." *Worcester v. Georgia,* 6 Pet. 515, 557, 8 L.Ed. 483 (1832). It followed from this concept of Indian reservations as separate, although dependent nations, that state law could have no role to play within the reservation boundaries. 'The Cherokee nation \* \* \* is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and this nation, is, by our Constitution and laws, vested in the government of the United States.' *Worcester v. Georgia, supra,* at 561, 8 L.Ed. 483. See also *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883).

\*　\*　\*　\*　\*　\*

" \* \* \* it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Nava-

jos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision. It is thus unsurprising that this Court has interpreted the Navajo treaty to preclude extension of state law—including state tax law—to Indians on the Navajo Reservation. See Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685, at 687, 690, 85 S.Ct. 1242, at 1243, 1245, 14 L.Ed.2d 165; Williams v. Lee, supra, 358 U.S. 217, at 221–222, 79 S.Ct. 269, at 271, 3 L.Ed.2d 251.

\*　　\*　　\*　　\*　　\*　　\*

"Finally, it should be noted that Congress has now provided a method whereby States may assume jurisdiction over reservation Indians. Title 25 U.S.C. § 1322(a) [25 U.S.C.S., § 1322(a)] grants the consent of the United States to States wishing to assume criminal and civil jurisdiction over reservation Indians, and 25 U.S.C. § 1324 [25 U.S.C.S., § 1324] confers upon the States the right to disregard enabling acts which limit their authority over such Indians. But the Act expressly provides that the State must act 'with the consent of the tribe occupying the particular Indian country,' 25 U.S.C. § 1322(a) [25 U.S.C.S., § 1322(a)], and must 'appropriately [amend its] constitution or statutes.' 25 U.S.C. § 1324 [25 U.S.C.S., § 1324]."

New Mexico has never sought and no New Mexico Tribe has ever agreed to a surrender of jurisdiction on Indian lands. The Navajo Tribe, in particular, has made considerable effort to establish the machinery necessary to perform its governmental tasks. For us to now say that the legislative enactments of the Navajo Tribal Council are unenforceable in this Court is to frustrate the Navajo's efforts and to destroy the concept of tribal sovereignty upon which federal-Indian relations are premised. My reading of Art. II, § 1, and Art. XXI, §§ 2 and 9, of the New Mexico Constitution prohibits us from assuming the position taken by the majority today. Under the Navajo's treaty with the United States and by the terms of our admission as a state, New Mexico is preempted from frustrating or otherwise challenging the basic and inherent capacity of the Navajo Tribe to govern itself.

## AUTHORITY OVER NON–INDIANS

The basic premise of defendant's argument is that:

"Since *Navajo Tribal Courts themselves have no jurisdiction over non-Indian defendants* and are therefore without power to enforce statutes or regulations passed to punish or penalize non-Indians, the law relied upon by appellant is meaningless. The State of New Mexico should not assume the burden of enforcing the laws of another jurisdiction when that jurisdiction cannot itself enforce the laws. By enforcing in New Mexico State courts a statute enacted by the Navajo Tribe but not enforceable in Tribal courts, New Mexico courts would be allowing the Navajo Tribe to dictate to the State of New Mexico which laws its courts may enforce." [Emphasis mine]

In my opinion this analysis is in error. Inherent in every sovereign is the power to govern the people and control the use of all property within its boundaries. The enactment of Sections 307 and 309, supra, was a valid exercise of the police power inherent in the Navajo Indian Tribe as an attribute of its sovereignty. The defendant by sending its agents on the Navajo Reservation subjected itself to the rules and regulations that the Tribal Council had established for the repossession of personal property.

It would be a logical non sequitur to hold as *Worcester* and *Williams* do that the Indian tribes are sovereign and then to hold that they cannot enforce the enactments of their legislatures and the orders of their courts against non-Indians. I be-

lieve that it is implicit in *Worcester, Williams* and *McClanahan* that they have such authority.

> "Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts. * * * The Tribe itself has in recent years greatly improved its legal system through increased expenditures and better-trained personnel. Today the Navajo Courts of Indian Offenses exercise broad criminal and civil jurisdiction *which covers suits by outsiders against Indian defendants.*" [Emphasis mine] Williams, supra.

In fact, Title 25 U.S.C.A., Sections 1302 and 1311 (1974 Supp.) making the Federal Constitutional protections of the Bill of Rights applicable to Indian tribes exercising powers of self-government and assuring individuals being tried in Courts of Indian Offenses the same rights, privileges and immunities as guaranteed by the United States Constitution indicates Congress' position regarding Indian tribal courts' authority over non-Indians. These sections speak of "individuals" rather than "Indians." See Dodge et al. v. Nakai et al., 298 F.Supp. 26 (U.S.D.C., D.Ariz.1969). It is apparent that by extending Constitutional protections to the tribal courts the Congress anticipated that non-Indians as well as Indians might be tried there. Clearly, the intent was that non-Indians being tried in tribal courts would be granted their Constitutional rights.

Defendant is also mistaken in its belief that by giving full faith and credit to Sections 307 and 309 we are assuming the burden of enforcing "the laws of another jurisdiction." It is the plaintiff's cause of action which is seeking enforcement, not the Tribal statutes. These statutes are not the law in New Mexico, but they give rise to a transitory right which we could only refuse to enforce if they violated some strong public policy of New Mexico. See Hughes v. Fetter, 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951). There is no New Mexico public policy prohibiting civil penalties. See Sections 22–20–1 through 22–20–4, N.M.S.A.1953.

The enactment of Sections 307 and 309 were a legitimate exercise of the authority residing in the Navajo Tribe to which we should accord full faith and credit. To do so would not only constitute compliance with § 1738, supra, but would also constitute compliance with those authorities that have given full faith and credit to the judgments and orders of the courts of several of the Indian Tribes. See Standley v. Roberts, 59 F. 836 (8th Cir. 1894); Mehlin v. Ice, 56 F. 12 (1893); Cornells v. Shannon, 63 F. 305 (8th Cir. 1894). In my opinion it is illogical to recognize the actions of one branch of government, but to deny the validity of other branches. The basis for recognition of one branch serves as the basis for the others.

## CHOICE OF LAW

The majority opinion states that the conflict of laws question was not raised in the trial court. I do not agree. Paragraph 10 of plaintiff's complaint states that: "In repossessing plaintiff's pickup from the Navajo Reservation without plaintiff's written consent or an Order of the Navajo Tribal Council [sic], CIT violated 7 N.T.C., § 307." Paragraph 12 recites that: "By the terms of 7 N.T.C., § 309, CIT is liable to plaintiff for damages for its violation of 7 N.T.C., § 307, in an amount at least equal to the finance charge on the loan plus ten per cent of the principal amount of the loan." The prayer asked the "court to find defendants jointly and severally liable to him in an amount not less than ten per cent of the principal amount of the loan plus the finance charge * * *"

One of the leading authorities in the field of conflicts of law states:

> "Any case whose facts occurred in more than one state or nation, so that in deciding the case it is necessary to make a choice between the relevant laws of the different states or countries, is a conflicts case." R. Leflar, Am. Conflicts Law, § 2, at 3 (1959).

The truck was purchased and financed in Farmington, New Mexico. The repossession took place on the Navajo Reservation. The plaintiff sued in the District Court of San Juan County asking that the court enforce the cause of action given him by the Navajo Tribal Code. The trial court made neither findings of fact nor conclusions of law. The arguments of counsel at the hearing on defendant's motion to dismiss were not transcribed. The conflicts of law question was raised below.

As to which law should apply, that of New Mexico or the Navajo Tribal Code, I am impressed with the sound reasoning in the case of Associates Discount Corp. v. Cary, 47 Misc.2d 369, 262 N.Y.S.2d 646 (Civ.Ct. City of N.Y.1965) where the court was faced with an almost identical situation:

"This is the tradition in the law of conflicts since Beale—that the law of the place of contracting governs the validity and effect of a contract of conditional sale, and will be enforced pursuant to its terms by a sister state unless it offends the public policy or positive statute of the sister state.

" * * * The neat and simplistic solution—application of the lex loci contractus—fails to meet the problem head on. We are concerned here not with the validity of the contract, or interpretation of the contract, or ascertainment as to whether there has been a breach of the contract—all of which are undisputed—but with the rules governing the remedies for an admitted breach of an admittedly valid contract.

"Pragmatic policy considerations would dictate that the local law of the jurisdiction where the remedies are sought to be invoked be accorded primacy. The self-help permitted in the area where the parties originally bargained may lead to a breach of the peace and worse in another place and another time."

I, therefore, believe that the Navajo Tribal Code should apply. See Universal C.I.T. v. Hulett, 151 So.2d 705 (La.App.1963).

## PENAL OR COMPENSATORY DAMAGES

Defendant's argument that we ought not to enforce Title 7, N.T.C., Section 309, because it is a penal statute was answered by Judge Cardozo, while he was still serving on the New York Court of Appeals in the case of Loucks v. Standard Oil Company of New York, 224 N.Y. 99, 120 N.E. 198 (1918). The case involved New York's wrongful death statute. Judge Cardozo after recognizing that generally the penal laws of one country or state will not be enforced by another, went on to state:

"Penal in one sense the statute indisputably is. The damages are not limited to compensation; they are proportioned to the offender's guilt. * * * But the question is not whether the statute is penal in some sense. The question is whether it is penal within the rules of private international law. A statute penal in that sense is one that awards a penalty to the state, * * * The purpose must be, not reparation to one aggrieved, but · vindication of the public justice. * * * the statute is not penal in the international sense. * * * It is true that the offender is punished, but the purpose of the punishment is reparation to those aggrieved by his offense.

*     *     *     *     *     *

" * * * It is penal in one element and one only; the damages are punitive. * * * But the punishment of the wrongdoer is not designed as atonement for a crime; it is solace to the individual who has suffered a private wrong."

It should be noted that the remedial provisions for civil recovery contained in § 309 of the Navajo Code are substantially the same as our provisions under § 50A–9–507(1), N.M.S.A.1953 (Repl.Vol. 8, pt. 1). Clearly the main purpose of Section 309 is to provide compensation for loss to the person wronged by the unlawful repossession of consumer goods.