571 P.2d 689

**Alice BROWN, Appellant,**

v.

**BABBITT FORD, INC., an Arizona Corporation, Appellee.**

**No. 1 CA–CIV 3363.**

Court of Appeals of Arizona,
Division 1,
Department C.

Aug. 30, 1977.

Rehearing Denied Oct. 7, 1977.

Review Denied Nov. 1, 1977.

Robert L. Miller, Tuba City, and Richard W. Hughes, Window Rock, for appellant.

Mangum, Wall & Stoops by Gerald W. Nabours, Flagstaff, for appellee.

## OPINION

JACOBSON, Presiding Judge.

In this appeal from a dismissal of plaintiff's complaint for failure to state a cause of action, we are asked to determine the legal effect of a Navajo tribal resolution which creates civil liability for repossessing personal property from within the Navajo Reservation in other than a prescribed manner.

Appellant-plaintiff, Alice Brown, brought an action in the Superior Court of the state of Arizona, Coconino County, seeking civil penalties prescribed by a resolution of the Navajo Tribal Council for failure of appellee, Babbitt Ford, Inc., to comply with a Navajo Tribal Council resolution concerning repossession of personal property within the boundaries of the Navajo Reservation. The trial court granted Babbitt Ford's motion to dismiss for failure to state a claim for which relief could be granted, and Brown has appealed.

The facts as alleged in Brown's complaint or as conceded by the parties are that Alice Brown is a Navajo Indian residing at Tuba City, Coconino County, Arizona. Tuba City is within the exterior boundaries of the Navajo Reservation and the state of Arizona.

On March 3, 1973, Brown purchased a 1972, one-half ton, Ford pickup truck from Babbitt Ford in Flagstaff, Arizona. Flagstaff, Arizona is outside the exterior boundaries of the Navajo Reservation. The purchase price of the pickup truck was financed in part by an installment sales security agreement with the pickup truck as the collateral for that agreement. This agreement provides, insofar as pertinent to this litigation, that in the event of a default occurring under the agreement, "Secured party shall have all rights and remedies for default provided by the Arizona Uniform Commercial Code, . . ." and that "[t]he validity, construction, and enforcement of this Agreement are governed by the laws of Arizona."

At all times pertinent here, A.R.S. § 44–3149 of the Arizona Uniform Commercial Code provided in part:

"Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession *a secured party may proceed without judicial process if this can be done without breach of the peace* or may proceed by action." (emphasis added)

The security agreement was assigned by Babbitt Ford to the Arizona Bank. Apparently Brown had difficulty keeping the payment current under the security agreement for on March 21, 1974, Brown refinanced the pickup with Babbitt Ford. The refinancing was also subject to an installment sale security agreement identical in pertinent terms to the original agreement. This agreement was also assigned to the Arizona Bank.

Sometime prior to December 21, 1974, Brown defaulted in the payments under the security agreement and Arizona Bank upon being paid the balance due under the agree-

ment by Babbitt Ford, reassigned the agreement back to Babbitt Ford.

On December 21, 1974 [1] agents of Babbitt Ford repossessed the pickup truck from the grounds of the Tuba City High School in Tuba City, Arizona. This repossession was accomplished without a breach of the peace and pursuant to the "self-help" provisions of the Arizona Uniform Commercial Code.

At the time of the repossession, the Navajo Tribal Council had passed a resolution (7 N.T.C. § 307) which provided in part that:

"§ 307.  Repossession of personal property.

"The personal property of Navajo Indians shall not be taken from land subject to the jurisdiction of the Navajo Tribe under the procedures of repossession except in strict compliance with the following:

"(a) Written consent to remove the property from land subject to the jurisdiction of the Navajo Tribe shall be secured from the purchaser at the time repossession is sought.  The written consent shall be retained by the creditor and exhibited to the Navajo Tribe upon proper demand.

"(b) Where the Navajo refuses to sign said written consent to permit removal of the property from the land subject to the jurisdiction of the Navajo Tribe, the property shall be removed only by order of a Tribal Court of the Navajo Tribe in an appropriate legal proceeding."

Section 309 of the Navajo Tribal Code (7 N.T.C. § 309) provides that any person who violates section 307 "shall be civilly liable to the purchaser," for a sum not less than "the credit service charge plus ten percent (10%) of the principal amount of the debt or the time price differential plus ten percent (10%) of the cash price."

Babbitt Ford neither secured the written consent of Brown at the time of repossession nor obtained an order of the Navajo Tribal Council prior to the repossession.

In this case, Brown sought damages, in addition to other relief, in a sum "equal to the time price differential plus ten percent (10%) of the cash price of her vehicle, as set forth in Plaintiff's original motor vehicle installment sale security agreement." In this case, that sum would be $1,213.04.

The sole issue raised by this appeal is whether the violation of § 307 of Title 7 of the Navajo Tribal Code will give rise to a cause of action in the Arizona State Superior Court.

At this juncture, in order to focus our inquiry, it is important to state what is not before us.  We do not have the issue of whether, if Brown had brought an action in Navajo Tribal Court for violation of § 307, and a judgment obtained in that forum [2] the state of Arizona would give either full faith and credit or comity to that judgment. Likewise, we do not have any issue as to whether the state of Arizona is attempting to enforce its laws or impose its authority within the boundaries of the Navajo Reservation.[3]  In fact, the opposite is true.  The jurisdiction of the Arizona courts has been invoked for the purpose of enforcing the statutory enactments of the Navajo Tribal Council.

In short, we have a dispute between two citizens of Arizona (one a Navajo Indian and the other a private corporation) concerning their contractual rights, obligations and actions.

Having thus narrowed our field of inquiry, we turn to Brown's contention as to

---

1.  It appears that the payoff to Arizona Bank and presumably its reassignment to Babbitt Ford did not occur until December 26, 1974. However, there is no contention by Brown that at the time of the repossession, Babbitt Ford was not entitled to exercise the rights of a secured party under the security agreement.

2.  Nor do we determine the jurisdiction of Navajo Tribal Court over non-Indians.

3.  See Adams v. Southern California First National Bank, 492 F.2d 324 (9th Cir. 1973), cert. denied, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974), holding that prejudgment self-help repossession authorized by state statute does not involve "state action."

why her complaint stated a cause of action. Her underlying thesis is that this is a conflict of laws case. Once that principle is accepted, she then argues that Navajo Tribal Law should govern and under that law she has a cause of action.

Central to her theory is the premise that a "law" exists which Arizona will recognize and thus create a conflict. The "law" sought to be recognized is, of course, 7 N.T.C. § 307 and it is urged that recognition of this law may be had either under the doctrine of full faith and credit or under the principles of comity.

### FULL FAITH AND CREDIT

■ Brown immediately concedes that under the rationale of *Begay v. Miller,* 70 Ariz. 380, 222 P.2d 624 (1950), 7 N.T.C. § 307 is not entitled to "full faith and credit" under U.S.Const. art. 4, § 1, as that clause applies only between states of the union. She does argue, however, that under federal law, 28 U.S.C. § 1738,[4] 7 N.T.C. § 307 is entitled to full faith and credit in the courts of the state of Arizona, because the Navajo Tribe is a "territory" within the meaning of that section. Since *Begay v. Miller, supra,* did not consider the effect of 28 U.S.C. § 1738, it is an open question in Arizona as to whether the Navajo Tribe is a "territory" so as to fall within the provisions of that statute.

At the outset, we recognize that the Supreme Court of our sister state of New Mexico has granted "territory" status to the Navajo Tribe within the meaning of 28 U.S.C. § 1738. *Jim v. CIT Services Corporation,* 87 N.M. 362, 533 P.2d 751 (1975). The New Mexico Supreme Court in turn relied upon the reasoning of the dissenting opinion of Judge Hernandez in the New Mexico Court of Appeals decision in the same case. 86 N.M. 784, 787–788, 527 P.2d

1222, 1227 (1974), *rev'd on other grounds,* 87 N.M. 362, 533 P.2d 751 (1975). Judge Hernandez in reaching his conclusion that the Navajo Tribe was a "territory" relied upon two cases—*Mackey v. Cox,* 59 U.S. 100, 15 L.Ed. 299 (1855), and *Americana of Puerto Rico, Inc. v. Kaplus,* 368 F.2d 431 (3rd Cir. 1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967). Admittedly, language from these cases would leave one to believe that Indian Reservations are "territories". For example, in *Mackey v. Cox, supra,* the United States Supreme Court stated:

"A question has been suggested whether the Cherokee people should be considered or treated as a foreign state or territory. The fact that they are under the constitution of the Union, and subject to Acts of Congress regulating trade, is a sufficient answer to that suggestion. They are not only within our jurisdiction, but the faith of the nation is pledged for their protection. *In some respects they bear the same relation to the federal government as a territory did in its second grade of government, under the Ordinance of 1787.* Such territory passed its own laws, subject to the approval of Congress, and its inhabitants were subject to the Constitution and Acts of Congress. The principal difference consists in fact that the Cherokees enact their own laws, under the restrictions stated, appoint their own officers, and pay their own expenses. *This, however, is no reason why the laws and proceedings of the Cherokee territory, so far as relates to rights claimed under them, should not be placed upon the same footing as other territories in the Union. It is not a foreign, but a domestic territory—a territory which originated under our Constitution and laws.*" (emphasis added) 15 L.Ed. at 301.

4. 28 U.S.C. § 1738 (1966) provides in part:
   "The Acts of the legislature of any State, *Territory,* or Possession of the United States or copies thereof, shall be authenticated by affixing the sale of such State, Territory or Possession thereto.
   \* \* \* \* \* \*

"Such Acts, records and judicial proceedings or copies thereof, so authenticated, *shall have the same full faith and credit in every court within* the United States and its *Territories* and Possessions as they have by law or usage in the courts of such State, *Territory* or Possession from which they are taken." (emphasis added)

However, *Mackey v. Cox, supra,* was not dealing with the interpretation of the predecessor of 28 U.S.C. § 1738, but rather with whether letters of administration issued by the probate court of the Cherokee nation was entitled to recognition in federal district court.

The New Mexico court then cites *Americana of Puerto Rico, Inc. v. Kaplus, supra,* for the proposition that:

"[T]he term 'Territories' has been considered susceptible of interpretation— that is, *it does not have a fixed and technical meaning that must be accorded to it in all circumstances."* (emphasis supplied by New Mexico Court) *Id.* 86 N.M. at 789–790, 527 P.2d at 1227–1228.

From these premises, the New Mexico Court concludes that the Navajo Indian Reservation may be interpreted to be a territory within 28 U.S.C. § 1738.

In our opinion, this analysis ignores the historical developments and the legal concepts associated with both territories of the United States and lands set aside for the use of Indian tribes within the United States.

The territorial system of the United States had its origins in a resolution of the continental Congress dated October 10, 1780, which provided that:

"Demense or territorial lands shall be disposed of for the common benefit of the United States, and be settled and formed into distinct republican states, which shall become members of the federal union and have the same rights of sovereignty, freedom, and independence as other states."

This was followed by ordinances of the Congress of the confederation in 1784 and 1787, the latter dealing with the territory northwest of the Ohio River. All of these ordinances were entered into prior to the adoption of the constitution, but dealt with lands *belonging* to the United States. Arti-

cle 4, Sec. 3 of the United States Constitution makes this clear:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property *belonging to the United States."* (emphasis added)

Thus the concept of "territory" embraced land belonging to the United States which had not yet achieved the status of independent sovereign states. From this concept devolved the definition of a "territory" as:

"A portion of the country not included within the limits of any State, and not yet admitted as a State into the Union, but organized under the laws of Congress with a separate legislature, under a territorial governor and other officers appointed by the President and Senate of the United States." *People ex rel. Kopel v. Bingham,* 211 U.S. 468, 475, 29 S.Ct. 190, 192, 53 L.Ed. 286, 289 (1909).

On the other hand, the federal government's relationship and dealing with "Indian Country" was upon an entirely different footing. This relationship historically recognized the sovereign status of Indian tribes and the dealings between these two sovereigns were conducted through treaties. These first treaties recognized the aboriginal lands of the tribe and defined its geographical extent. For example, one treaty fixed a "boundary line between the United States and the Wiandot and Delaware nations." Treaty with the Wiandot, Delaware, Chippewa and Ottawa Nations, Jan. 21, 1785, Article 3, 7 Stat. 16.[5]

In essence, Indian country did not "belong to" the United States and thus by definition could not fall within the U.S. Const. art. IV, § 3, authorizing Congress to deal with territories, and thus could not historically be so considered.

This historical analysis led the court in *Ex Parte Morgan,* 20 F. 298, 305–306 (D.C. Ark. 1883) to observe:

his Britannic Majesty and the Choctaw Nation * * * shall be the boundary between the settlements of the Mississippi Territory and the Choctaw Nation." Federal Indian Law, 602 (1966).

---

**5.** This recognition of boundary lines was a continuation of the policy adopted by the British Crown. *See* Treaty with the Choctaw Nation, Dec. 17, 1801, Article 3, 7 Stat. 66, which provided "that the old line of demarcation heretofore established by and between the officers of

"Both the word 'state' and the word 'territory' have attached to them, under the constitution and laws of the United States, a technical meaning. The Cherokee Nation does not come within this meaning, but it is a part of what is called 'Indian country.' Early in the life of the country a certain section of the domain of the nation was set apart as Indian country. By the advancing tide of white population and the formation of new territories first, and then states, much of what was then Indian country has ceased to be such, and has become states in the Union; but the Cherokee Nation maintains the same *status* to-day in its relations to the federal government as it did when first set apart by such government,—not as a state or territory, but as a home of the Indian. These Indians have, from the foundation of the government, been treated as being separate and apart from the states and territories of the Union, and this tribe as well as all others are contradistinguished by a name appropriate to themselves, and one differing from either a state or a territory. They belong to the republic, though they are neither a state or territory in it." (emphasis in original)

Obviously, the distinction between lands "belonging to" the Indian tribes and the lands "belonging to" the United States has long disappeared. *See* 25 U.S.C. § 71 (1966).[6]

It is now generally conceded, with a few exceptions, that the rights of Indian tribes to the land they occupy are those of "use and occupation" and the fee is in the United States. *Johnson v. McIntosh*, 8 Wheat. 543 (1823). However, for the purposes of our analysis, the observations made in *Ex Parte Morgan, supra,* are as valid today as they were in 1883, that is, that Indian reservations have never been considered as a "territory" within the meaning of the laws of the United States, but simply they are the home of the Indians. This analysis is apropos to the Navajo Tribe. The territory of Arizona was created by President Lincoln on February 24, 1863, when it was separated from the New Mexico territory, Compiled Laws of the Territory of Arizona, 13 (1871). The Navajo Indian Reservation was not created until 1868, when by treaty:

"The United States agrees that the following district of country, to wit: [legal description] shall be, and the same is hereby, set apart for the use and occupation of the Navajo Tribe of Indians . . . .." Treaty with the Navajo Tribe of Indians, June 1, 1868, Article II, 15 Stat. 667.

We do not believe it can be logically argued that the Arizona Territorial Act of 1863 was considered to have the same status as the "use and occupation" treaty of 1868 with the Navajo Indians. This analysis has not touched upon the New Mexico Supreme Court's conclusion that the word "territory" is susceptible to interpretation. However, the cardinal rule of any statutory interpretation is to attempt to ascertain the intent of the legislative body which enacted that statute. *State v. Airesearch Mfg. Co.,* 68 Ariz. 342, 206 P.2d 562 (1949). Again, applying the historical analysis, previously set forth we must conclude that Congress could not have intended that the word "territory" as used in 28 U.S.C. § 1738 would include Indian reservations.

We therefore conclude, based upon these historical developments, that regardless of how we designate the particular status of Indian tribal governments, the word "territory" as used in 28 U.S.C. § 1738 was not intended to apply to them.

We thus hold that 28 U.S.C. § 1738, does not require the courts of the state of Arizona to give full faith and credit to the enactment of the Navajo Tribal Council.

### COMITY

Having determined that Arizona courts are not required to recognize Navajo Tribal

---

6. This statute provides:

"No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired." R.S. § 2079.

enactments, we must now determine whether under principles of "comity", such recognition should be extended.

■ In general, the principle of "comity' is that the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect. *Kittel v. Kittel,* 194 So.2d 640 (Fla.App.1967) *rev'd on other grounds* 210 So.2d 1 (Fla.); *Jacobsen v. Saner,* 247 Iowa 191, 72 N.W.2d 900 (1955); *Jackson v. Shuttleworth,* 42 Ill. App.2d 257, 192 N.E.2d 217 (1963).

In *Begay v. Miller, supra,* the Arizona Supreme Court specifically held that the recognition of a Navajo Tribal Court divorce decree was not based upon the principles of comity. But the simple fact is that the Supreme Court went ahead and recognized the validity of that decree. Likewise, *In re Lynch's Estate,* 92 Ariz. 354, 377 P.2d 199 (1962), the Arizona Supreme Court recognized that a will admitted to probate in the Navajo Tribal Court should be admitted in state court without further proof under A.R.S. § 14–343, which gives that effect to wills admitted to probate in "another state or foreign country." The court stated:

"We are therefore of the opinion that the proceedings held in the Navajo Tribal Court must be treated the *same as* proceedings in a court of another state or foreign country, and that A.R.S. § 14–343 is applicable to the case at bar." (emphasis in original) *Id.* at 357, 377 P.2d at 201.

Again, *In re Lynch, supra,* does not speak in terms of comity, but the result is the same.

■ While generally the principles of comity only apply between independent sovereign jurisdictions, *Begay v. Miller, supra,* Arizona has fully recognized the validity of Navajo Tribal Court decisions in the courts of Arizona. Moreover, the United States Supreme Court in *McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 174–175, 93 S.Ct. 1257, 1263, 36 L.Ed.2d

129, 137 (1973), touched on the issue of Navajo Tribal sovereignty:

"[I]t cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision."

■ We do not need to here determine the "sovereignty" status of the Navajo Tribe[7] suffice it to say that if a sufficient independent status exists in the Navajo Tribe for the courts of this state to recognize the validity of Navajo Tribal Court decisions, then, under principles of comity, like recognition should be extended to legislative enactments of the Navajo Tribal Council, provided, of course, such legislative enactments are not contrary to the public policy of this state. *Hughes v. Fetter,* 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951).

## CONFLICTS OF LAW

Babbitt has argued, that even if, as a general principle, the courts of Arizona should, under the principles of comity, recognize legislative enactments of the Navajo Tribe, recognition should be withheld as to 7 N.T.C. § 307, because it is penal in nature. *Jim v. CIT Financial Services Corp., supra.* (New Mexico Court of Appeals decision, Lopez, J., specially concurring opinion, *Id.,* 86 N.M. at 787–789, 527 P.2d at 1225, 1226; *The Antelope,* 10 Wheat 66, 6 L.Ed. 268 (1825).

■ While this argument is compelling, we need not decide this case on the characterization of 7 N.T.C. 307. As previously indicated, this is a suit between private individuals, the subject matter of which is covered by contract between them. Under such a contract, the parties were free to make a choice as to the law applicable to their contractual relationship. As stated in A.R.S. § 44–2205:

"Except as provided hereafter in this section [not applicable here], when a

---

7. Obviously, the Navajo Tribe is sovereign only to the degree that the federal government allows it to be. *United States v. Blackfeet Tribe* *of Blackfeet Indian Reservation,* 364 F.Supp. 192 (D.C.Mont.1973), reaffirmed, 369 F.Supp. 562 (D.C.Mont.1973).

transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. . . ."

There is no contention that this section of the Arizona Uniform Commercial Code was not applicable to the contract entered into in Arizona between Arizona citizens, the subject matter of which, insofar as pertinent, never left the exterior boundaries of Arizona.

The parties have by their contract made a choice of law covering the transaction. First, by granting to seller all rights granted by the Arizona Uniform Commercial Code, including the right to self help in repossession upon default, and second, by specifically stating that the contract would be interpreted and enforced under Arizona law.[8]

By doing so, the parties have by contract excluded the possibility that this contract would be affected by the provisions of the Navajo Tribal Court.[9] Applying the agreement of the parties to this transaction, it is clear that Babbitt had the right under Arizona law to do exactly what it did in repossessing the pickup without liability. *See Cook and Sons Equipment, Inc. v. Killen,* 277 F.2d 607 (9th Cir. 1960).

Since Brown's complaint alleges no other facts which, under the laws of the state of Arizona, would subject Babbitt Ford to any liability, the trial court properly dismissed her complaint for failure to state a claim for relief.

Judgment affirmed.

DONOFRIO and OGG, JJ., concur.

---

8. Appellant Brown characterizes these provisions of the contract as being one of "adhesion" and that by signing this contract with these provisions she was waiving "a constitu-tional protected right of due process." Neither of these contentions has any merit whatsoever.

9. The same effect would result in New Mexico, under *Jim v. CIT Financial Services, supra.*