377 P.2d 201

**Charles W. ALLEN, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and Baum & Adamson Tire & Automotive Service, Respondents.**

No. 7538.

Supreme Court of Arizona,

En Banc.

Dec. 28, 1962.

Boyle, Bilby, Thompson & Schoenhair, and W. E. Dolph, Jr., Tucson, for petitioner.

James D. Lester, Phoenix, Donald J. Morgan, Edward E. Davis, C. E. Singer, Jr., Lorin G. Shelley, Ben P. Marshall, Phoenix, of counsel, for respondent Industrial Commission.

JENNINGS, Justice.

By certiorari we here review an award of the Industrial Commission (hereinafter called Commission) denying Charles W. Allen (hereinafter called petitioner) further compensation for injuries sustained in an accident arising out of and in the course of his employment on June 1, 1956.

On June 1, 1956 petitioner was employed by Baum & Adamson Tire & Automotive Service (hereinafter called Baum & Adamson) as a service salesman. On that date he was involved in an accident.[1] As a result of the accident, petitioner suffered the loss of his right eye by enucleation and sustained a 30% permanent partial functional disability of his right (major) hand. Petitioner subsequently returned to work for Baum & Adamson at his previous wage and performed substantially the same duties as he performed before the accident.

The Commission found that petitioner's injuries resulted from an accident which arose out of and in the course of his employment; that his physical condition became stationary on February 12, 1958; that because petitioner sustained multiple sched-

---

[1]. At the time of the accident petitioner was 36 years old and had been employed by Baum & Adamson for about nine years.

uled injuries, compensation had to be awarded, pursuant to A.R.S. § 23–1044, Subsection C,[2] as if such injuries were unscheduled; and that since petitioner returned to work at the same rate of pay as that received prior to his injury he suffered no loss of earning capacity as a result of the accident. Petitioner was therefore denied further compensation. Upon rehearing the Commission affirmed its previous findings and award. Thereafter, petitioner brought the matter before this Court by writ of certiorari. We set the award aside in Allen v. Industrial Commission, 87 Ariz. 56, 347 P.2d 710 (1959). Following the decision of this Court the Commission held additional hearings and thereafter entered its findings and award wherein it was ordered that the "applicant take nothing further by reason of his claim for benefits heretofore filed herein". The findings and award of the Commission were affirmed on rehearing and the matter again brought before this Court by writ of certiorari.

We stated in our earlier opinion of this case that the findings of the Commission should be affirmed if supported by competent evidence. However, we held that the findings of the Commission were not supported by competent evidence and therefore set the award aside. In order for us to vary from our original position in this case it is necessary to determine whether the evidence presented to the Commission since that time is sufficient to now sustain the findings of the Commission. The petitioner contends that the evidence does not sustain the findings and therefore the award should be set aside.

The findings of the Commission are in part as follows:

"5. That following his release to a working status * * * the applicant became employed at his regular occupation with the defendant employer performing full time substantially the same duties as before the accident, at his previous salary. That the applicant has continued working at his regular occupation with the defendant employer.

"1. That during the calendar year of 1960 the applicant earned * * * [$7,102.00] as a Commercial Tire

**2.** Subsection C provides:

"In cases not enumerated in subsection B of this section, where the injury causes permanent partial disability for work, the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from the disability, but the payment shall not continue after the disability ends, or the death of the injured person, and in case the partial disability begins after a period of total disability, the period of total disability shall be deducted from the total period of compensation."

Salesman for the defendant employer * * *.

* * * * * *

"7. That the applicant's physical disabilities do not prevent him from performing the duties of his occupation, nor do said disabilities prevent him from performing the duties which he performed prior to injury. That the applicant's physical disabilities do not materially nor significantly decrease nor impair the quality of his performance of the duties required of him both prior and subsequent to his injury.

"8. That the applicant's physical disabilities do not decrease his ability to secure employment related to his regular occupation performed at the time of injury, such employment as a commercial tire salesman.

* * * * * *

"10. That the applicant is considered as employable and as eligible for advancements, promotions and raises as a commercial tire salesman by employers in Tucson, Arizona, in competition with the defendant employer * * *.

* * * * * *

"12. On the basis of the foregoing findings of fact, this Commission finds that the applicant has an earning capacity equal to or in excess of his earning capacity prior to injury and has sustained no loss thereof by reason of his injury of June 1, 1956 nor by reason of the physical disability resulting therefrom."

The Commission contends that Finding No. 5 is supported by the evidence. The "new evidence" upon which the Commission relies to sustain such finding is that the petitioner has continued in the employ of Baum & Adamson; that petitioner made $7,102 during the calendar year of 1960; that petitioner is earning about the same as two other employees of Baum & Adamson;[3] and that petitioner's employer testified that he was satisfied with petitioner's performance as a commercial tire salesman. The Commission contends that these factors support their position that petitioner has a capacity to perform and earn comparable to an experienced salesman in spite of his handicap.

The evidence which the Commission contends supports Finding No. 5 is substantially the same now as it was in the previous case. True, petitioner is making more per month now than he was before the injury. However, there is ample testimony in the record to support petitioner's contention that "the pay for persons engaged in the business in which petitioner is employed

3. Petitioner's employer testified that one of his employees earned $7,500 during 1960 and that another earned $6,000.

has risen considerably since the date of the injury and that the increase was due, at least in part and probably to a major extent, to general business conditions and inflation." Ralph R. Bailey, a witness for the Commission, testified that the basic wage for commercial tire salesmen had increased by about one-third since 1956. He stated that the basic guarantee or wage "may have increased by one hundred or two hundred a month since that time." Three other witnesses testified that the general scale of wages for commercial tire salesmen had increased since 1956 due to economic conditions.

Although petitioner's employer testified that he was satisfied with petitioner's performance he also stated that his reasons for retaining him on the payroll was his loyalty to a loyal employee and that he did not "feel that Mr. Allen was anywhere near as capable of doing the job after the accident as he was before." He also testified that "we sort of had to modify our job to suit Mr. Allen's physical requirements and physical ability."

In support of Finding No. 7 the Commission relies upon the medical report of the doctors [4] wherein it was stated:

"* * * Since the last consultation, the patient has continued working at his usual occupation, and has had no specific subjective complaints referrable to his hand. The patient states he is able to do his occupation as well as he did prior to his injury. When asked specifically if he can do everything with the hand that he could prior to his injury, he states he feels he can. He does admit that it is not quite as dextrous, and is a little more clumsy, but he is able to accomplish the same functions as prior to his injury. Since the last consultation, the patient feels that it is much stronger, and feels that it is as strong as it was prior to his injury. Specifically, the patient mentions that he can still change tires as he used to prior to his injury, but states that his present duties do not require him to change as many tires as he did prior to his injury. The patient has some difficulty in changing tires due to the loss of depth perception from his loss of the one eye, but feels that this is not contributed to by his hand injury."

The doctors concluded:

"It is the opinion of the undersigned examiners that this patient now demonstrates a 20% anatomic loss of the right hand. Functionally, for his present job, he has no disability by his own admission, and this is substantiated by the examination. There is obviously total loss of the right eye. Apparently

---

4. Petitioner was examined in group consultation by Drs. C. A. Guarino, J. W. Cortner, and J. R. Schwartzmann on March 8, 1960.

neither his eye disability or his hand disability impair his present working ability. * * *"

On July 17, 1961 Drs. Schwartzmann and Cortner were called to testify with reference to the report at a hearing held by the Commission. Dr. Schwartzmann testified in part as follows:

"Q [By petitioner's attorney] And part of your conclusions here is that functionally for his present job he has no disability by his own admission, now, is that portion of your conclusion limited to his present job?

"A That was the only thing we could limit it to because we preceded that with a definite observation of structural loss in the hand.

"Q And it was very apparent or obvious that his eye was out and that his hand was deformed, you can see that visually?

"A We described that.

"Q Do you have any opinion, Dr. Schwartzmann, as to the effect of these injuries on Mr. Allen if he were thrown out into the open labor market on his ability to obtain employment or to hold employment?

"A He might—in a situation of being on a—well, if he were not employed or if he were looking for a job competitively I think he would find that the anatomic loss of his hand would considerably influence his ability to find jobs, as to finding the type of job he looked for.

"Q And also his eye, would that have anything—

"A His eye as well, yes, sir.

"Q And would your opinion be that those injuries would impair his ability to obtain or hold employment?

"A It could very easily impair it. It depends on the requirements of the individual who was hiring him and certainly from the standpoint of performing certain jobs, it would impair him, yes."

Dr. Cortner testified in part as follows:

"Q [By petitioner's attorney] And your objective findings show that he did sustain a serious loss of function of the right hand?

"A That is correct.

"Q And it was apparent to all of you that he also lost an eye?

"A Yes, sir.

"Q Do you have an opinion, an opinion of your own, that if Mr. Allen were thrown on the open labor market as to whether these dis-

abilities would affect his ability to obtain and to hold a job?

"THE REFEREE: May I suggest that there is not enough foundation laid for that question. We don't know whether the doctor is familiar with the requirements of various jobs, it is too general in nature. It is too general in nature as to the duties required to be performed in any job.

"MR. DOLPH: You can redirect him on that, if you want.

"Q [By Mr. Dolph] Doctor, do you have such an opinion?

"A I remember what Mr. Allen did, or what he told us he did in 1960, but I am not sure what he is doing now, so without knowing his job, I couldn't tell you whether he would have trouble in the open labor market or not.

"Q Well, let's say that the job that he had in 1960, do you have an opinion if these injuries would affect him in obtaining a job involving those same duties if he were thrown on the open labor market?

"A. Yes, I have an opinion.

"Q What is that opinion?

"A I feel that he would have difficulty or would be at a disadvantage competing against people who were completely normal for that type of job.

"Q And these duties that you say you are familiar with are those which are contained in your previous report, are they not?

"A Yes.

\*    \*    \*    \*    \*    \*

"Q Now in your conclusions in your opinion dated March 8, 1960, one portion of it is that functionally for his present job he has no disability by his own admission. Now, that is limited to the present job, is it not?

"A That is correct.

"Q And you base that primarily upon what he told you?

"A That is correct.

"Q And in another portion of your examination is that apparently neither his disability or his hand disability impairs his present workability. Now that doesn't say whether you are talking about his present job, the job he had at that time, or his ability to do other things, or to get another job. Were you referring to his complaint at that time?

"A Yes, that was the only thing we had to base it on. The patient

said he had returned to his employment and had lost no money as far as wages were concerned, that he does not do the job quite as rapidly as he did and he was still getting the same amount of money and was holding his job."

Once again the evidence disputes the finding of the Commission. For, as stated in our earlier opinion:

"* * * It is uncontradicted that the enucleation of petitioner's right eye resulted in loss of depth perception and that the injury to his right hand resulted in loss of function. It is further indisputable that these injuries affected his ability to perform his work and, consequently, his ability to earn a living. Although petitioner was performing practically the same duties as before, he was unable to accomplish them as efficiently, as quickly, or, indeed, as well as before. Such decrease in the quality of performance must necessarily affect the earning capacity of the petitioner here." [5] 87 Ariz. 67, 347 P.2d 717.

The Commission contends that the evidence supports the finding that the petitioner's disabilities do not decrease his ability to secure employment related to his regular occupation [6] and the finding that the petitioner is employable and eligible for advancements, promotions and raises as a commercial tire salesman.[7] The only "new evidence" in support of these findings was the testimony of two competitive employers in Tucson. Although both witnesses [8] testified that the petitioner was "employable" as a commercial tire salesman and eligible for advancements, promotions and raises, both stated that they would not employ petitioner with his present handicap if they needed to fill one position comparable to that which petitioner occupies if both petitioner and another person equally qualified but without petitioner's handicaps were available. In addition, Chester A. Vasey, manager of the Firestone Store in Tucson, testified as follows:

"Q * * * I want you to state whether or not if you had a position of tire salesman, commercial tire salesman, or a combination commercial tire salesman and service man, whether or not those injuries [of petitioner's] would affect your willingness to hire a man in the first instance in a position like that that you had open?

"A Yes, it would, no question about it.

"Q All right, how would it affect you?

---

5. In addition, petitioner's present job was tailored to accommodate his handicaps.
6. Finding No. 8.

7. Finding No. 10.
8. One witness was an assistant manager and had done no actual hiring.

"A Well, of course, you have assumed here that things are equal, but actually there are practically no two individuals who are equal in qualifications. The man that is handicapped, to obtain that type of position he would have to qualify in a much—in other words, he would have to have other qualifications that were much better in order to do that kind of job. If their qualifications were the same you would hire the person who didn't have the physical handicap. There is no question about it, because even though an outside salesman, his duties are primarily sales solicitation, yet there is some physical function he has to do for a customer that requires him to have his full physical facilities."

Petitioner's employer testified on this point as follows:

"Q If you hadn't known Charlie Allen before and hadn't had him employed can you answer Mr. Lester's question that you would consider him employable? Would you have employed with these handicaps, starting from scratch?

"A I would say no, I wouldn't do that.

"Q And if you had a job opening requiring the services that were necessary in the job that he now has; and you had applications from Mr. Allen with his present handicap, and from another man who had identical qualifications to his, other than those handicaps, which man would you take?

"A Well, naturally you take the man that didn't have the handicaps."

And Dr. Cortner testified that he thought petitioner would have difficulty in obtaining work if he were thrown out on the open labor market. His testimony on this point was as follows:

"Q [By the Referee] Now, if I told you that three employers have tire salesmen such as Mr. Allen is at the present time or was on March 8, 1960, when you examined him, if they testified that they consider Mr. Allen in his present or in his then condition as employable, your opinion of course would have to be varied accordingly?

*   *   *   *   *   *

"A I have no doubt that Mr. Allen is employable, no matter who is trying to evaluate him. My only point is that if you, from my experience, take two men who have the same training and there is only one job open, the man who has a crippled hand and the blind eye is the one least likely to be hired."

The "new evidence" submitted to the Commission since our last decision in this case is not sufficient to cause us to vary from our original position that "the award of the Commission denying permanent compensation to petitioner is not supported by competent evidence."

The award is set aside.

BERNSTEIN, C. J., UDALL, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concurring.