Mabel MEXICAN, Plaintiff and Appellant,

v.

Irene CIRCLE BEAR and Sarah Mexican, Defendants and Appellees,

and

Campbell Paula Quinn Funeral Home, Defendants.

No. 14917.

Supreme Court of South Dakota.

Argued May 22, 1985.

Decided July 3, 1985.

Michael Depree of Dakota Plains Legal Services, Eagle Butte, for plaintiff and appellant.

Ramon Roubideaux, Rapid City, for defendants and appellees.

Keith A. Tidball of Tidball & Johnson, Pierre, for amicus curiae Cheyenne River Sioux Tribe; B. Kevin Gover of Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., of counsel.

WOLLMAN, Justice.

This is an appeal from a judgment of the circuit court quashing a temporary restraining order and releasing the body of Charles Mexican, deceased, to his sisters, Irene Circle Bear and Sarah Mexican. We reverse and remand with directions to give recognition to the order of the Cheyenne River Tribal Court.

Charles Mexican and Mabel Mexican (for convenience we will refer to decedent and the parties by their first names) were married on March 17, 1955. Mabel is an enrolled member of the Cheyenne River Sioux Tribe of South Dakota; Charles was an enrolled member of the Oglala Sioux Tribe of South Dakota. Irene and Sarah are enrolled members of the Oglala Sioux Tribe.

Charles and Mabel were long-time residents of Red Scaffold, South Dakota, which is located within the boundaries of the Cheyenne River Sioux Reservation. Charles served as a medicine man for the Sioux Nation. He became ill in late 1984 and was treated at the Indian Health Services Hospital in Eagle Butte, South Dakota. On January 8, 1985, Indian Health Services personnel transferred Charles to Sioux Sanitorium Hospital in Rapid City, where he remained until the time of his death on March 14, 1985. During his period of hospitalization in Rapid City, Charles was not visited by Mabel, which caused him to feel estranged from and unhappy with her. During his period of hospitalization Charles executed a will that purported to disinherit Mabel.

Prior to January 8, 1985, Charles' directions to Mabel were that he wished to be buried with his mother at Bridger, South Dakota. During his period of hospitalization, however, Charles expressed his desire that he be buried either with his deceased father at Rockyford, located within the boundaries of the Pine Ridge Indian Reservation, or in Rapid City, or in such place as designated by his son, John Mexican. Charles further stated that he did not want to be buried at Red Scaffold, South Dakota, and that he wanted his sisters to make arrangements for the disposal and burial of his body.

Upon learning of Charles' death and of his sisters' plans to bury him in Rapid City, Mabel obtained from the Cheyenne River Sioux Tribal Court on March 15, 1985, an ex parte order enjoining Irene and Sarah from burying Charles' body and directing those having physical custody of the body to turn it over to Mabel. Upon learning that Campbell Paula Quinn Funeral Home, which had custody of the body, would not honor the tribal court order, Mabel applied to the circuit court on March 16 for a temporary restraining order and order to show cause why Irene and Sarah and the funeral home should not be permanently enjoined from interfering with her rights and duties under state law to dispose of her husband's body. The trial court issued a restraining order and order to show cause. A hearing on the order to show cause was held in Rapid City on March 18. Irene and Sarah moved to continue the circuit court proceedings until the Cheyenne River Sioux Tribal Court had been given a chance to hold a hearing on the order that it had issued on March 15.

On March 19 a hearing was held in the Cheyenne River Sioux Tribal Court, at which Irene and Sarah, together with John Mexican and one of Irene's daughters, testified in support of Irene's and Sarah's contentions that Charles and Mabel were estranged at the time of Charles' death and that Charles had directed that he be buried at a place other than on the Cheyenne River Reservation. Counsel for Irene and Sarah stated during the course of the hearing that "our claim is a tribal custom and usage, that's our claim to the body of Charles Mexican." Again, in arguing his clients' position at the conclusion of the hearing, counsel stated:

[I]t would appear that the court could take judicial notice whatever the court considers tribal custom to be because I think that's a controlling matter here. I don't think the State law has really anything to do with it.... We feel that since the court has taken the matter over

we're moving the court to vacate its Order of March 15, 1985. That the court indicate in an Order where it considers the tribal custom to be and that particular order would be a very great use by Judge Konenkamp who now has to make the final decision concerning this matter in Rapid City. But, I do know that he wants to know. He wants the tribal custom and usage of the tribe to be taken into consideration when he makes his decision. I think that's the way he's going to go. The State law might provide for white people. I do feel that he's not bound just like we're bound to accept state law. Most of the Judges are looking to give full faith and credit to tribal court orders and I think that's a good development. I think they're really looking to us to give them some advice in this matter that they know little or nothing about.

At the conclusion of the hearing, the tribal judge entered oral findings from the bench, reduced to writing and filed on March 20, and awarded custody of Charles' body to Mabel.

Among other things, the tribal court judge found that the customs of both the Oglala Sioux Tribe and the Cheyenne River Sioux Tribe are that upon the death of a married person the surviving spouse, absent any showing that the parties were separated at the time of death, has the duty to bury the deceased spouse and the right to custody of the body for the limited purpose of burial. The tribal court found that Charles and Mabel were not separated at the time of Charles' death. The tribal court also found that the will that Charles had executed on March 11, 1985, contained no direction regarding his wishes for the disposition of his body upon his death.

On March 20, 1985, a further hearing was held before the circuit court in Rapid City. The trial court was made aware of the tribal court judge's findings of fact and order. At the close of the hearing, the circuit court quashed its March 16 temporary restraining order and entered a judgment awarding the custody of Charles'

body to Irene and Sarah. This appeal followed. The trial court stayed its judgment pending our decision on appeal.

SDCL 34-26-1 provides:

Every person has the right to direct the manner in which his body or any part thereof shall be disposed of after his death, and to direct the manner in which any part of his body which becomes separated therefrom during his lifetime shall be disposed of. The provisions ... of §§ 34-26-14 to 34-26-19, inclusive, do not apply where such person has given directions for the disposal of his body or any part thereof inconsistent with those provisions.

SDCL 34-26-14 provides in part: "The person charged by law with the duty of burying the body of a deceased person is entitled to the custody of such body for the purpose of burying it...."

SDCL 34-26-16 provides in part:

The duty of burying the body of a deceased person ... devolves upon the persons hereinafter specified:

(1) If the decedent was married the duty of burial devolves upon the husband or wife;

. . . .

Although there is no property right as such in a dead body, the right to bury a dead body has been recognized by the courts as a quasi-property right. *See, e.g.,* 22 Am.Jur.2d *Dead Bodies* § 4 (1965); 25A C.J.S. *Dead Bodies* § 2 (1966). The importance of the interest of the living in the bodies of the dead has been characterized as follows:

"We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed; none more sacred to the individual, nor more important of preservation and protection from the point of view of public welfare and decency...."

*Scarpaci v. Milwaukee County,* 96 Wis.2d 663, 672, 292 N.W.2d 816, 820 (1980) (*quoting Koerber v. Patek,* 123 Wis. 453, 102 N.W. 40 (1905)). It is with a recognition of

and an appreciation for the highly personal nature of the right to arrange for the burial of the body of a deceased family member that we approach the resolution of the issue before us.

Mabel advances three arguments in support of her contention that the circuit court erred in entering its order of March 20, 1985: (1) that the circuit court lacked jurisdiction; (2) that the circuit court should have given full faith and credit to the tribal court's order; and (3) that the circuit court should have given recognition and effect to the tribal court's order under the doctrine of comity. We find it necessary to discuss only the last of these arguments.

The doctrine of comity has been defined as follows:

> The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call "the comity of nations." Although the phrase has been often criticised, no satisfactory substitute has been suggested.
>
> "Comity," in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95, 108 (1894).

The *Hilton* Court went on to specify the circumstances that must exist as a condition precedent to the application of the doctrine of comity:

> [W]e are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and

under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

159 U.S. at 202–03, 16 S.Ct. at 158, 40 L.Ed. at 122.

The *Hilton* conditions have been paraphrased as follows:

> (1) the foreign court actually had jurisdiction over both the subject matter and the parties; (2) the decree was not obtained fraudulently; (3) the decree was rendered by a system of law reasonably assuring the requisites of an impartial administration of justice—due notice and a hearing; and (4) the judgment did not contravene the public policy of the jurisdiction in which it is relied upon.

*In re Marriage of Red Fox,* 23 Or.App. 393, 398, 542 P.2d 918, 921 (1975). *See also Malaterre v. Malaterre,* 293 N.W.2d 139 (N.D.1980); *Medical Arts Bldg. Ltd. v. Eralp,* 290 N.W.2d 241 (N.D.1980).

This court has long recognized and applied the doctrine of comity. *See Emerson-Brantingham Implement Co. v. Ainslie,* 38 S.D. 472, 161 N.W. 1001 (1917); *Knittle v. Ellenbusch,* 38 S.D. 22, 159 N.W. 893 (1916). *See also Seaboard Surety Co. v. First Nat'l Bank & Trust Co.,* 121 F.2d 288 (8th Cir.1941).

Tribal governments are unique in the federal system. They derive their powers of government from their inherent sovereignty and not by delegation from the federal government. *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Indian tribes exist as

sovereign entities with powers of self-government. *See, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *United States v. Wheeler, supra; United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). This retained sovereign power may, of course, be divested by Congress. *See, e.g., National Farmers Union Insurance Companies v. Crow Tribe,* —— U.S. ——, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); *United States v. Wheeler, supra.*

■ One of the attributes of tribal sovereignty is the power to adjudicate private civil disputes. As the United States Supreme Court stated in the *Martinez* case, *supra,* "Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." 436 U.S. at 65, 98 S.Ct. at 1681–82, 56 L.Ed.2d at 119–20.

■ We join with those courts that have held that tribal court orders should be recognized in state courts under the principle of comity. *Allen v. Industrial Commission,* 92 Ariz. 357, 377 P.2d 201 (1962); *Begay v. Miller,* 70 Ariz. 380, 222 P.2d 624 (1950); *Wippert v. Blackfeet Tribe, Etc.,* —— Mont. ——, 654 P.2d 512 (1982); *In re Marriage of Limpy,* —— Mont. ——, 636 P.2d 266 (1981); *State v. District Court, Etc.,* 187 Mont. 209, 609 P.2d 290 (1980); *In re Marriage of Red Fox, supra.*

■ In reaching this conclusion, we of necessity hold that the prerequisites to the application of the doctrine of comity as expressed in *Hilton v. Guyot, supra,* have been met.

With respect to the matter of jurisdiction, it is clear beyond peradventure that Irene and Sarah voluntarily submitted to the jurisdiction of the Cheyenne River Tribal Court by litigating the merits of the conflicting claims regarding the custody of Charles' body.

Counsel for Irene and Sarah forthrightly acknowledged during oral argument before this court that his clients were not contending that the March 20 tribal court order was obtained fraudulently.

The order was rendered by a court that gave the competing parties adequate opportunity to present evidence on their conflicting claims. Based upon our review of the transcript of the March 19, 1985, hearing and the findings of fact, conclusions of law, and order entered following the hearing, we are satisfied that the parties were afforded an impartial hearing that satisfied the requirements of due process. *Cf. In Matter of Guardianship of Sasse,* 363 N.W.2d 209 (S.D.1985). True, the March 15, 1985, order was entered ex parte, but that was merely in the nature of a temporary order, as was the circuit court order of March 16.

■ There remains the question whether the fact that tribal custom with respect to custody of a dead body is different from South Dakota law on the subject is reason enough to deny comity to the tribal court order. In *Knittle, supra,* the court was faced with the contention that it should not apply the law of a foreign state to the detriment of a citizen of South Dakota when there was no South Dakota law that would require the same result.

Appellant refers to the well-established rule that:

"Foreign laws are not regarded where they conflict with our own regulations, our local policies, or do violence to our views of religion or public morals. The principles of comity do not require the courts of one state to enforce rights under the statutes of another, to the prejudice of our own citizens nor when complete justice cannot be done." 1 Lewis Sutherland, Statutory Construction, 24.

To what extent is the rule of comity to be understood as restricted under the above declaration? It is perfectly apparent that, if comity is so restricted that a

substantive law of the state of the contract will be disregarded whenever the state of the forum does not have the same law, the doctrine of comity becomes a farce. It is also a farce if a citizen of this state, who enters into a contract in a foreign state, will not be held to the effects of such contract by the courts of this state simply because so to hold him would be "to the prejudice of our own citizen."

38 S.D. at 27, 159 N.W. at 895. The court then went on to give several examples of cases in which the court of the forum state will not give effect to a foreign judgment under the principle of comity, none of which are applicable to the case before us.

We conclude that the fact that tribal custom is different from state law in that the right of a surviving spouse to the custody of the body of the deceased spouse for the purpose of burial takes precedence over the deceased spouse's express burial wishes is not reason enough to deny effect to an order based upon that custom. We would be hard pressed to say that the state legislature could not constitutionally repeal SDCL 34–26–1. Given the diversity of decisions regarding the right to custody of a dead body for burial purposes, see generally Annot. 54 A.L.R.3rd 1027 (1973), we would be guilty of parochialism if we were to hold that tribal custom regarding that right is so abhorrent to the policy expressed in state law that it may not be given effect. Accordingly, we hold that recognition and enforcement of the tribal court order of March 20, 1985, would not contravene the public policy of this state.

The judgment appealed from is reversed, and the case is remanded to the circuit court with directions to enter a judgment recognizing and giving effect to the tribal court order of March 20, 1985.

FOSHEIM, C.J., MORGAN, J., and WUEST, Acting J., concur.

HENDERSON, J., concurs in result.

HENDERSON, Justice (concurring in result).

Out of courtesy and respect to the tribal judge's order, and as a willingness to grant a privilege, and not as a matter of right, but out of deference and good will, on behalf of the highest Court of this state, I would apply the principle of judicial comity to the tribal judge's order of March 20, 1985, which awarded the custody of Charles Mexican's body to his wife, Mabel Mexican. I do not recognize that the principle of the comity of nations should be here applied;[1] and, hereby, I ascribe to the belief, in law, that there is a distinction between judicial comity and comity of nations. Comity is begotten from the womb of mutual respect and is not a child of obligation. We must live in mutual respect with our Indian brothers who serve on the trial courts of the various Indian reservations in South Dakota. They, in return, should likewise extend unto our courts reciprocating courtesy and respect.

I am particularly touched, in this case, that Charles Mexican was a medicine man for the Indian people. I am deeply respectful of the First Amendment and the right of the Indian people to worship the Great Spirit. This worship anteceded on the North American Continent, by centuries, the religion of the white men who came to these shores. I am touched to the point of deepest compassion for the widow of Charles Mexican who desires that her husband be buried at a place of repose which she selects. The words of this tribal judge weigh heavily on me. His bench decision of March 19, 1985, reduced to writing and filed on March 20, 1985, gives us a deep insight into his consideration of tribal custom:

---

1. The 1894 United States Supreme Court case, cited extensively by the majority opinion, involves the nation of France; I find that decision to be inapplicable to the facts and time at hand. Moreover, it was stated that in the absence of statute or treaty, the comity of this country does not require that judgments of a foreign country be recognized as conclusive in this country, where such foreign country does not give like effect to our own judgments. *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

Now for the Counsel for the Plaintiff and the Defense. I do know a lot of things pursuant to history and custom regarding the custody of this body. First of all to the audience here, know that the Great Sioux Nation was before Pine Ridge; it was before Cheyenne River; it was before Ft. Yates and any of the other reservations. We were all one people at one time. The custom does not vary from one reservation to another today. You must understand that. And the thing that exists with the case we are talking about today—and that is—you've all heard the expression—the older ones in the crowd here know the expression that was used when a young lady married into another Tribe and she passed away. The same for the man marrying into another Tribe who chose to remain with that Tribe and died there. You know what that means. Those are the traditions and we are getting away from them. You are all completely against tradition and custom today, let me tell you. You are dealing with the spirit of a medicine man. That is dangerous. You don't know what spirit can do; his spirit will not rest in peace if this court is to grant the request of the relatives. That man chose to marry here, there was not a divorce here, he died while he was still married to this woman. I will now rule for Mabel Mexican on this issue here simply based on tradition and custom, but I do want to leave this word with all of you, being relatives. This is a sad time indeed for all of you no matter which side you are on. You must bring yourself to understand that to come together to respect the memory of a medicine man you must put your feelings aside and no matter where he will be buried come to that funeral. You've all expressed your desires. You've all expressed that you loved him. That's what you need to do—don't let the white man's law or any other law tear you apart. If you respect custom and tradition, then respect our tradition and come, all of you. That I will leave with you. This Court now stands adjourned.

Bear in mind that counsel for the two sisters, himself also a Native American, prevailed upon the tribal court judge to take judicial notice and consider tribal custom because he believed that it was the "controlling matter here." Certainly, out of courtesy, complaisance, and respect, the "white man's law," in the jargon of the tribal judge, should recognize the customs of the Indian people in burying their dead.

It is true that this state has addressed the doctrine of comity as set forth in the 1916 and 1917 cases cited in the majority opinion. However, we were there concerned in the 1917 case with the recognition of a Wyoming mortgage; in the 1916 case, we were dealing with a sister state's law, that of Nebraska, and specifically a Bulk Sales Law of that state to which we applied comity. Sister state to sister state is one thing. Nation to nation is quite another. In this case, within a state, we are addressing comity in a more limited geographic and conceptual scope. Perhaps the Sioux Tribe was, in the vernacular of the tribal judge, historically recognized by its own people as the "Great Sioux Nation," as the tribal judge referred to it in the above-quoted proceeding. The "Sioux Nation," however, cannot be a nation within a nation. We have but one nation, indivisible, and it is called the United States of America.[2] Therefore, I am willing to give unto the judicial decision of this tribal judge all due deference and respect, as I have heretofore set forth, but not out of any recognition that the "Sioux Nation" is an independent nation within the United States of America. The Constitution of the United States of America established but

---

**2.** *See Brown v. Babbitt Ford, Inc.,* 117 Ariz. 192, 197–98, 571 P.2d 689, 694 n. 6 (1977). *See also,* 25 U.S.C.A. § 71, at 49 (1983), which provides:

No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.

one nation. I wish to quote with approval language in *Brown v. Babbitt Ford, Inc.,* 117 Ariz. 192, 197–98, 571 P.2d 689, 694–95 (1977), for the reason that it is aligned more closely with my thought on the general subject of states and Indian tribes when addressing comity and full faith and credit:

We thus hold that 28 U.S.C. § 1738, does not require the courts of the state of Arizona to give full faith and credit to the enactment of the Navajo Tribal Council.

\* \* \* \* \* \*

In general, the principle of "comity" is that the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect....

\* \* \* \* \* \*

... [G]enerally the principles of comity only apply between independent sovereign jurisdictions....

"[T]he Navajo Tribe is sovereign only to the degree that the federal government allows it to be." *Brown,* 571 P.2d at 695 n. 7. *See also, Rice v. Rehner,* 463 U.S. 713, 719, 103 S.Ct. 3291, 3295, 77 L.Ed.2d 961, 970 (1983), *reh'g denied,* —— U.S. ——, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983), "[t]he sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." (Emphasis omitted) (quoting language in *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303, 312–13 (1978)).