**John DODGE et al., Plaintiffs,**

**v.**

**Raymond NAKAI, Allen V. Adams, and Graham Holmes, Defendants.**

**No. Civ-1209 Pct.**

United States District Court
D. Arizona.
March 1, 1969.

See also D.C., 298 F.Supp. 17.

Jeremy E. Butler and Monroe G. Mc-Kay, of Lewis, Roca, Beauchamp & Linton, Phoenix, Ariz., for plaintiffs.

Harold E. Mott, Albuquerque, N. M., and Edmund D. Kahn, Window Rock, Ariz., for the Navajo Tribe of Indians.

## OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

CRAIG, District Judge.

■ The above entitled cause was instituted by certain named plaintiffs, members of the Navajo Tribe of American Indians, residents of the Navajo Indian Reservation in the District of Arizona; Dinebeiina Nahiilna Be Agaditahe, Inc., an Arizona nonprofit corporation, hereinafter referred to as DNA, serving as a delegate agency under the United States Office of Economic Opportunity for the purpose of providing legal services to indigent Navajo Indians; two Navajo Indians, residents of the Navajo Indian Reservation in the District of Arizona, representing a class of indigent Navajo Indians receiving legal services from DNA; and Theodore R. Mitchell, the Program Director of DNA, residing at Fort Defiance, Arizona within the boundaries of the Navajo Indian Reservation, for the purpose of enjoining defendants Raymond Nakai, Allen V. Adams and Graham Holmes from enforcing an order of removal directed against plaintiff Mitchell, issued by the Advisory Committee of the Navajo Tribal Council August 7, 1968, and an exclusion order issued against plaintiff Mitchell by the Advisory Committee of the Navajo Tribal Council August 8, 1968.

Plaintiffs also seek damages in the amount of Ten Thousand Dollars ($10,-000) and such further relief as to the Court may seem appropriate.

The defendant Raymond Nakai is Chairman of the Navajo Tribal Council, residing at Window Rock, Arizona, within the Navajo Indian Reservation.

Allen V. Adams is the Superintendent of the Navajo Police Department, also residing within the Navajo Indian Reservation at Window Rock, Arizona.

Defendant Graham Holmes is the Area Director of the Navajo Indian Reservation for the Bureau of Indian Affairs, and resides within the Navajo Indian Reservation at Window Rock, Arizona.

Defendants previously filed a motion to dismiss, which was argued to the Court, memoranda briefs filed by the several parties, submitted and denied by this Court.

The matter was thereafter tried to the Court and at the conclusion of plaintiffs' case, the defendant Holmes renewed the motion to dismiss which was granted.

The resolution of August 7, 1968 by the Advisory Committee of the Navajo Tribal Council directed the defendant Nakai to cause the immediate removal of plaintiff Mitchell from the Reservation, and to notify Mitchell that a hearing would be held August 8, 1968, in order to allow Mitchell to show cause why he should not be permanently excluded from the Reservation. Mitchell was removed from the Reservation, pursuant to the resolution of August 7th at the direction of defendant Nakai and defendant Adams. He was allowed to return for the hearing of August 8th in the company of a Navajo policeman, and at the conclusion of the hearing, on August 8th, he was permanently excluded from the Reservation.

Defendants assert that the exclusion orders were within the scope of the authority of the Navajo Tribe as set forth in Article II of the Treaty of 1868 between the United States of America and the Navajo Tribe of Indians (15 Stat. 667). The defendants also assert that the Civil Rights Act of 1968, 25 U.S.C. § 1302 et seq., is not applicable in the instant case.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(1), 1343(4), 1361 and 1651.

## I.

■ Article II of the Treaty of 1868 between the United States of America and the Navajo Tribe of Indians (15 Stat. 667) provides that the Navajo Reservation shall be set aside for the "use and occupation" of the Navajo Tribe. In addition the United States agreed in that provision that "no persons except those herein so authorized to do, and except such officers, soldiers, agents and employees of the government, or of the Indians, as may be authorized to enter upon Indian Reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article." This provision reserves to the Navajo Tribe the power to exclude non-Navajos from the Navajo Reservation, with the exception of those persons authorized to enter thereon by virtue of the treaty itself, a law of the United States, see Navajo Tribe v. N. L. R. B., 109 U.S.App.D.C. 378, 288 F.2d 162 (1961), or an order of the President of the United States.

■ Congress may modify the manner in which Indian tribes may exercise their quasi-sovereign powers. See Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); Colliflower v. Garland, 342 F.2d 369 (9th Cir. 1965). In enacting Title II of the Civil Rights Act of 1968, 25 U.S.C. §§ 1301–03, Congress imposed upon Indian tribes exercising powers of self-government many of the restrictions imposed upon the Federal Government by the Bill of Rights and upon the states through judicial interpretation of the Fourteenth Amendment. Whatever may have been the autonomy of the Navajo Tribe prior to the passage of this legislation, this Act of Congress imposed new responsibilities upon the Tribe with respect to both the manner in which it could exercise its governmental powers and the objectives that it could pursue through their implementation.

■ The power to exclude non-Navajos from the Navajo Reservation was exercised by the Advisory Committee of the Navajo Tribal Council and was clearly an exercise of the "powers of self-government" possessed by the Navajo Tribe. The question before this Court, therefore, is whether the exclusion of Mitchell from the Navajo Reservation was lawful in light of Title II of the Civil Rights Act of 1968.

## II.

DNA is a nonprofit legal services corporation organized under the laws of the State of Arizona. DNA was created to act as a delegate agency to receive funds made available by the Office of Economic Opportunity, hereinafter referred to as OEO, to the Office of Navajo Economic Opportunity, hereinafter referred to as ONEO, for the purpose of conducting a legal services program for indigent Navajo Indians. On or about February 25, 1967, the first delegate agency contract between DNA and ONEO was executed. On or about March 3, 1967, plaintiff Mitchell was named by the Board of Directors of DNA to be its Director.

From its inception DNA maintained a degree of independence from Navajo tribal governmental agencies. The independence of DNA was thought to be essential if DNA was to avoid conflicts of interest that might arise if DNA provided effective legal assistance to indigent Navajos who sought its services.

The policy of independence adopted by DNA became a matter of concern to members of the tribal government. A series of events point to the increasing opposition of tribal leaders to the operation of DNA and the retention of Mitchell as its Director.

(1) On August 31, 1967, the delegate agency contract between ONEO and DNA expired. A prolonged period of negotiations for renewal of the contract commenced. One of the principal issues in these negotiations was the independence of DNA and the continued employment of its Director.

(2) On October 17, 1967, Peter Mac-Donald, Executive Director of ONEO, informed the ONEO Executive Board that it was the opinion of defendant Nakai that DNA has embarrassed him very much in some instances, and that the contract under negotiations should correct these misunderstandings. Other members of the ONEO Executive Board expressed the view that DNA was too independent and indicated a desire that Mitchell be removed as its Director. (Exhibit 6).

(3) On February 5, 1968, Nakai informed ONEO's Executive Board that he would sign a new delegate agency contract with DNA only on condition that at the end of the contract period Mitchell be removed as Director and the Board of Directors be reorganized. (Exhibit 10).

(4) On February 7, 1968, the Navajo Tribal Council approved a resolution calling for a report on the activities of DNA.

(5) On April 16 and 17, 1968, the Navajo Tribal Council convened to consider the operation of DNA and the performance of Mitchell as its Director. After extended discussion of the serious allegations set forth in Exhibit 12, the Council tabled a resolution that called for the discharge of Mitchell as Director and the termination of the ONEO-DNA delegate agency contract. (Exhibit 13).

(6) On April 17, 1968, outside the Council Chambers, Mrs. Annie Wauneka, a member of the Advisory Committee, told Mitchell that it was her desire that he leave the Navajo Reservation.

(7) On June 28, 1968, the Advisory Committee passed a resolution demanding that Mitchell be dismissed as Director of DNA. This demand was the direct result of the Advisory Committee's disapproval of the participation of DNA in a dispute with respect to the operation of the Chinle School system. (Exhibit 15).

(8) On July 3, 1968, Nakai notified Mitchell that in the event he did not accede to the Committee's demand within fourteen days, the Advisory Committee "shall be forced to take further action against you." (Exhibit 20). While the June 28th resolution does not refer to Mitchell's exclusion from the Navajo Reservation, Nakai interpreted that resolution as instructing him to take whatever steps were necessary to remove Mitchell from the Navajo Reservation. (Exhibits 18 and 23).

(9) On July 17, 1968, the Navajo Tribal Council passed a resolution authorizing the execution of a delegate agency contract with DNA for the period September 1, 1967, to August 31, 1968. (Exhibit 25).

(10) On July 20, 1968, the Board of Directors of DNA refused to discharge Mitchell, stating that insufficient grounds existed to warrant that action. (Exhibit 24).

(11) On August 2, 1968, a member of the Advisory Committee requested a report from the Legal Department of the Navajo Tribe as to the status of the Committee's demand that Mitchell be discharged as Director of DNA. Edmund Kahn, assistant general counsel to the Tribe, informed the Advisory Committee that its only recourse was the drastic step of excluding Mitchell from the Navajo Reservation. (Exhibit 26, pp. 57–60).

(12) On August 5, 1968, the Advisory Committee met with representatives of the Department of the Interior to discuss the Civil Rights Act of 1968. Mrs. Annie Wauneka inquired whether the Act would prevent the Navajo Tribe from evicting someone from the Navajo Reservation. Durard Barnes, Acting Associate Solicitor on Indian Affairs, Department of the Interior, began his answer with what appeared to be a question as to whether Mrs. Wauneka had a particular individual in mind. Mrs. Wauneka interrupted to state that she did not. The record of the meeting reflects the existence of laughter at this point. The testimony before this Court indicates that several individuals laughed on this occasion, including two members

of the Advisory Committee. The laughter of Mitchell is acknowledged as the loudest and most noticeable. Mrs. Wauneka addressed Mitchell, admonishing him for laughing in the Council Chambers. Significantly, the meeting continued without further interruption. There appeared to be no necessity for the presiding officer to call the meeting to order following the "interruption." (Exhibit 3, pp. 84–85).

(13) On August 6, 1968, the Advisory Committee reconvened to continue discussions with the Washington delegation. During this meeting, Mrs. Wauneka rose from her seat, walked to the entrance of the Council Chambers where Mitchell was seated, and made inquiry as to whether Mitchell intended to laugh once again. Mitchell attempted to apologize for his laughter of the previous day, but Mrs. Wauneka replied that she was not interested in an apology. She then struck Mitchell several times and ordered him to leave the Council Chambers; Mitchell left. After a recess, the Advisory Committee discussed the Mitchell incident. Several members noted a history of difficulty between Mitchell and the Navajo Tribe, and the suggestion was made that Mitchell be removed from the Reservation. After adoption of a motion calling for the submission of a resolution to the Advisory Committee on the next day, the Committee adjourned. (Exhibit 3, pp. 121, 126–28, 132–33).

(14) On August 7, 1968, the Advisory Committee convened and, in a thirty minute session, passed nine resolutions without debate. One of these resolutions called upon defendant Nakai (1) to cause the immediate removal of Mitchell from the Reservation, and (2) to serve notice upon Mitchell that he could re-enter the Reservation on August 8, 1968, in the company of a Navajo policeman, for the purpose of presenting himself before the Advisory Committee to show cause why he should not be permanently excluded therefrom. (Exhibit 3, pp. 134–48).

(15) On August 8, 1968, the Advisory Committee convened to conduct a hearing. The Committee heard from several of its members, including a description of the events by Mrs. Wauneka. Mitchell was permitted to make a statement in his own behalf, but his request to bring witnesses before the Committee after the noon recess was rejected. By a vote of 12–3, the Committee permanently excluded Mitchell from the Reservation. (Exhibit 3, pp. 162–181).

### III.

■ Defendants contend that the "obnoxious conduct" of Mitchell in the Council Chambers on August 5, and the subsequent assault on August 6, form the sole basis for the temporary removal order of August 7 and the permanent exclusion order of August 8. They contend that Mitchell's laugh was in the nature of a guffaw, full of ridicule and scorn for the Advisory Committee, and so obnoxious as to provoke the assault by Mrs. Wauneka. Assuming arguendo that defendant's description of the laugh is correct, and that the laugh and the subsequent assault formed the sole basis for Mitchell's exclusion, this Court would hold that the exclusion of Mitchell from the Navajo Reservation by the Advisory Committee was in violation of 25 U.S.C. § 1302.

■ Under 25 U.S.C. § 1302(8), the Navajo Tribe is prohibited from depriving any person of liberty or property without due process of law. Due process requires governmental entities to utilize reasonable means in seeking to achieve legitimate ends. Banishment is a severe remedial device. By virtue of the Treaty of 1868, the substantial (and rapidly increasing) number of non-Navajos living and working on the Navajo Reservation are subject to the possible invocation of the Tribe's power of exclusion. By virtue of 25 U.S.C. § 1302(8), these individuals are entitled to the assurance that they are not subject to be summarily ejected from their homes and separated from their employment because of the disfavor of the ruling segment of the Navajo Tribe. At the very least these individuals are entitled to believe that

they are secure in their homes and work so long as they do not run afoul of one of the grounds for exclusion set forth in Title 17, Section 1782 of the Navajo Tribal Code. Under defendant's version of this case, it is difficult to construe the action of the Advisory Committee as being based upon anything other than a personal dislike for the conduct of Mitchell, conduct in the form of laughter that was deemed to be disrespectful to members of the Advisory Committee. Invocation of the drastic power of exclusion for this reason is wholly unreasonable. This view is supported by the fact that no ground for exclusion enumerated in the Navajo Tribal Code justifies the exclusion of Mitchell for this reason or for any other reason that might be deduced from the facts presented to this Court.

In addition, non-Navajos living on the Navajo Reservation look to the tribal government for goods and services normally provided by state and local governments; the quality of life for all persons living on the Reservation is directly affected by the actions taken by tribal agencies. Under 25 U.S.C. § 1302 (1), these individuals possess the right to express views as to the wisdom and propriety of the policies and programs adopted by tribal governmental agencies. It is important to note, therefore, that defendants do not seek to justify the exclusion of Mitchell on the ground that his laughter disrupted the decorum required in a meeting of the Advisory Committee.[1] Thus, this case is unlike United States v. Woodard, 376 F.2d 136 (7th Cir. 1967) and State v. Smith, 46 N.J. 510, 218 A.2d 147, cert. denied, 385 U.S. 838, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966), where criminal penalties were held to have been properly imposed on persons disrupting legislative meetings *because of the disturbance created.* Rather, defendants appear to justify Mitchell's exclusion upon their inter-

pretation of his laughter, *i. e.*, because it was an expression of ridicule and scorn for members of the Advisory Committee. No one would deny that a laugh similar to one described by defendants is reprehensible, and that the laughing party is to be properly disapproved.

■ Assuming arguendo that defendants' version of the case is correct, this Court holds that Mitchell's exclusion from the Navajo Reservation was unlawful under 25 U.S.C. § 1302(8) as lacking in due process and under 25 U.S.C. § 1302(1) as abridging freedom of speech.

This Court does not accept defendants' version of the case; nor does the Court accept plaintiffs' view of the dispute. The facts demonstrate a disagreement between the tribal government and the administration of DNA as to the proper objectives of a legal services organization operating on the Navajo Reservation. The tribal officials thought the program should be directed toward protecting Navajo Indians from forces beyond the Reservation (Plaintiffs' Exhibits 30 and 41); DNA thought the program should include the representation of indigent Navajo Indians before agencies of the tribal government itself. This disagreement, and the desire of the Tribe to both limit the independence of DNA and restrict its sphere of activities through negotiation of the new ONEO-DNA contract, does not constitute an unlawful effort to destroy DNA or to deny indigent Navajo Indians their right to effective legal assistance. The tribal government, through ONEO, is entitled to negotiate for provisions in the ONEO-DNA contract that may curtail DNA's activities or subject that organization to closer supervision by ONEO. Similarly, the demands by the Advisory Committee that Mitchell be removed as Director of DNA do not constitute unlawful activities. Just as members of the Advisory Committee are subject to criticism for the manner in which they perform

---

1. The permanent exclusion of Mitchell from the Reservation could hardly be considered a reasonable means of restoring order in the Council Chambers in light of many equally effective, less drastic alternatives that could have been employed to do so.

their functions, the Director of DNA may be subject to charges of incompetence and unsuitability for the position that he occupies.

█ On June 28, 1968, the Advisory Committee demanded the removal of Mitchell as Director of DNA, and this demand was based upon the opinion of the Advisory Committee that Mitchell had improperly involved himself in the so-called Chinle School dispute. On July 20, 1968, the Board of Directors of DNA refused to accede to the demand of the Advisory Committee, finding no cause to remove Mitchell. Not being able to secure its desired aims through the presentation of a demand upon the Board of Directors of DNA, the Advisory Committee then sought to achieve its goal through the order of exclusion. That Mitchell's exclusion was but an extension of the Advisory Committee's desire that he be removed as Director of DNA seems incontrovertible. Chairman Nakai believed from the beginning that the resolution of June 28 demanding Mitchell's removal as Director of DNA contemplated his eventual removal from the Reservation. Indeed, Nakai informed Mitchell that further action would be taken by the Advisory Committee should he refuse to accede to the Committee's demand. The Advisory Committee's meeting of August 2, only five days prior to the order of exclusion, discussed exclusion as the only remaining means by which Mitchell could be removed as Director of DNA. The Advisory Committee meeting of August 6th reveals that the laughing incident and the subsequent assault was viewed by the members of the Committee as merely one event in a long standing dispute with Mitchell. Finally, the resolution calling for the removal of Mitchell from the Reservation refers to his refusal to resign as Director of DNA, terming this refusal an act of defiance of the Advisory Committee. In short, Mitchell was excluded from the Reservation because of the Advisory Committee's continuing disapproval of his involvement in the Chinle School dispute. This action by the Advisory Committee constitutes an abridgment of free speech on the Navajo Reservation, both the freedom of speech of the lawyer who is representing his clients in a manner deemed acceptable to his employer, and the freedom of speech of the clients who seek out that lawyer to act as their spokesman in the community.

Under 25 U.S.C. § 1302(9), Indian tribes exercising powers of self-government are prohibited from passing "any bill of attainder or ex post facto law."

"A bill of attainder is a legislative act which inflicts punishment without a judicial trial." Cummings v. Missouri, 4 Wall. 277, 323, 18 L.Ed. 356 (1867). See United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

"[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder * * *." United States v. Lovett, 328 U.S. 303, 315–316, 66 S. Ct. 1073, 1079, 90 L.Ed. 1252, (1946).

█ The Advisory Committee is an executive committee of the Navajo Tribal Council and, as such, possesses legislative authority on the Navajo Reservation. However, with respect to enforcement of the power of exclusion, the Navajo Tribal Code vests the Advisory Committee with judicial powers. Navajo Tribal Code, Title 17, Sections 1781–86. Thus, the form of government utilized on the Navajo Reservation does not lend itself to the nice categorizations that may be made where the branches of government are more distinct.[2] Two questions arise: was the August 8th exclusion order a "legislative act" of the Nav-

---

2. The Navajo Tribe is not required to establish distinct branches of government. Cf. Sweezy v. New Hampshire, 354 U.S.

234, 255, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Dreyer v. Illinois, 187 U.S. 71, 84, 23 S.Ct. 28, 47 L.Ed. 79 (1902).

**34**

ajo Tribe, and if so, did it impose "punishment" upon Mitchell without a judicial trial?

■ The reasons for exclusion set forth in the August 7th order, which became the basis for the August 8th order, do not come within any of the grounds for exclusion set forth in the Navajo Tribal Code, Title 17, Section 1782. At no time prior to Mitchell's exclusion did the Advisory Committee act in a rule-making capacity by amending the Code's enumeration of the grounds for exclusion. No rule of general application subjects other non-Navajos to possible exclusion for engaging in the conduct allegedly committed by Mitchell. Therefore, it is impossible to conclude that the Advisory Committee in ordering Mitchell's exclusion, was acting in a judicial capacity, a role characterized by the interpretation and individual application of existing rules of general application. Rather, the Advisory Committee acted in a legislative capacity, and the order of August 8th constituted a "legislative act" of the Navajo Tribe.

■ The factors to be considered in determining whether a legislative act imposes "punishment" on a person are set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Upon consideration of those factors, the Court concludes that the exclusion of Mitchell from the Navajo Reservation constitutes "punishment" as that term has been interpreted by the Courts.

■ The Court concludes that the August 8th order of exclusion constitutes an unlawful bill of attainder. In reaching this conclusion the Court has considered and rejected the view that this order may be justified as an exercise of the power to punish persons in contempt of the legislative or judicial process. The facts in this case simply do not support the acceptance of that view.

### IV.

The orders of exclusion of August 7th and August 8th were unlawful under the Civil Rights Act of 1968, and the action undertaken by defendants Nakai and Adams, pursuant to those orders, were without lawful authority.

The foregoing statement shall constitute findings of fact and conclusions of law herein.

It is ordered, adjudged and decreed that the defendants Nakai and Adams, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them, are permanently enjoined and restrained from threatening, ordering, attempting, or in any manner acting to enforce the orders of removal and exclusion issued by the Advisory Committee of the Navajo Tribal Council, dated August 7, 1968, and August 8, 1968.

It is further ordered, adjudged and decreed that plaintiffs take nothing by way of damages.

It is further ordered, adjudged and decreed that plaintiffs shall have and recover their costs herein expended.