MEMORANDUM OF DECISION DEFENDANT’S MOTION TO DISMISS

WILSON, Judge.
This case involves two important questions concerning the sovereign immunity of The Mohegan Tribe of Indians of Connecticut: (1) whether the Tribe has waived its immunity from suit for damages by a former employee whose due process rights were found to have been violated after his termination and during the process of his appeal from that termination; and (2) whether the Indian Civil Rights Act *594 (“ICRA”) abrogated the tribe’s immunity from such suit. The Defendant has moved to dismiss.
I.
This case is a civil action for damages brought by a former employee of the Defendant under the Mohegan Torts Code MTO 2001-07 (“Torts Code”), and the Indian Civil Rights Act, 25 L.S.C. S 1202, Constitutional Rights (“ICRA”)[1].
This case had its genesis in a prior decision of this court, LaPlante v. Office of the Director of Regulation, 2 G.D.R. 72, 5 Am. Tribal Law 316, 2004 WL 5660121 (2004) (Eagan, J.). A consideration of the facts and the conclusions of that case is necessary to an understanding of this one. That case (“LaPlante I”) may be summarized as follows:
“The plaintiff, Ralph LaPlante, appealed to this court from an order of the Mohegan Tribal Gaming Authority, (MTGC) Office of the Director of Regulations, revoking his gaming license for his alleged theft of casino chips by placing the chips in his toke box for tips. One of the main items of evidence introduced by the defendant at the administrative hearing was a videotape, which was used to show that Mr. LaPlante had misappropriated a toke to his own use. During the presentation of the evidence in this court, it was revealed that the tape had been edited and approximately 12 minutes was missing from the videotape. Mr. LaPlante argues that the missing twelve minutes would provide exculpatory evidence explaining the taking of the chips. Mr. LaPlante also claims that prior to the administrative hearing he had requested a copy of the videotape. Mr. LaPlante had an opportunity to view the videotape for the first time ai the administrative hearing held on April 23, 2003. In sustaining the plaintiffs appeal the court holds that the due process rights of the plaintiff were violated in the limited circumstance where an edited videotape was not given to the plaintiff prior to the administrative hearing.”
The court did not rule on the question whether the editing of the tape was suffi ciently prejudicial to the Plaintiff to invali date the prior ruling. Rather, the court found that the Plaintiff did have a right to view the videotape prior to the administrative hearing on his appeal from the lieenst revocation; that the Plaintiff did not havt an opportunity to do so; that substantial prejudice to the Plaintiff occurred; and that the Plaintiff was deprived of the opportunity to adequately respond to the charges which formed the basis of the revocation of his unemployment license. Because “adequate notice of evidence to be submitted against the Plaintiff is a fundamental requisite of due process rights under the Indian Civil Rights Act,” the court concluded that the Plaintiff had been deprived of such due process rights, the Plaintiffs appeal was sustained, and judg ment entered reversing the decision. 2 G.D.R. at 75, 5 Am. Tribal Law at 321-22. 2004 WL 5660121. The Defendant in that case, the Office of the Director of Regulation, appealed the decision to the Mohegan Gaming Disputes Court of Appeals. At the oral argument in this court on the Motion to Dismiss, it was disclosed that the appeal in LaPlante I was resolved by *595 the action of the Director of Regulation reinstating the Plaintiffs gaming license; by the Plaintiff agreeing not to pursue employment at the Mohegan Sun Casino; and by the Defendant’s withdrawal of its appeal. The appeal was withdrawn on January 27, 2005. This case was commenced by a writ, summons and complaint filed on August 26, 2005.
II.
The action filed in this court which is the subject of the Motion to Dismiss is in four counts, summarized as follows: “Count One: Negligence” alleges that the Defendant operates the Mohegan Sun Casino, a gaming facility owned by the Mohegan Tribe of Indians, a federally recognized Indian Tribe. The Plaintiff was employed as a poker dealer by the Defendant and on February 13, 2003, the Defendant accused the Plaintiff of stealing money. The Defendant referred these allegations to the Office of the Director of Regulation, and provided a surveillance tape of the Plaintiffs actions as proof of the Plaintiffs alleged theft. The Director of Regulation revoked the Plaintiffs gaming license, and as a result, the Plaintiff was terminated from his employment at the Casino. The Plaintiff alleged that the Defendant edited the tape and removed approximately twelve minutes from the tape in order to make it appear that the Plaintiff had committed the alleged theft, when, in fact, he had not. The Plaintiff then appealed the license revocation as set forth in Part I of this opinion. The Plaintiff further alleges that he suffered damages, including monetary damages, damage to his reputation, ¡and emotional distress. The Plaintiff alleges that these damages were caused by the negligence of the Defendant in several different respects, all relating to the editing of'the tape.
; “Count Two: Negligent Infliction of ’¡Emotional Distress” reiterates the allegations of Count One and alleges liability of the Defendant based on creating an unreasonable risk of causing emotional distress.
“Count Three: Violation of Indian Civil Rights Act and Due Process Claims” alleges that the conduct of the Defendant violated the Plaintiffs rights to due process of law as protected by the ICRA, and that the Plaintiff suffered damage as a result thereof.
“Count Four: Breach of the Implied Covenant of Good Faith and Farr Dealing,” was abandoned by the Plaintiff at oral argument on the Defendant’s Motion to Dismiss, and therefore, this court has not considered it.
The Defendant moved to dismiss the entire complaint. The Defendant asserted that the Defendant has not waived its sovereign immunity from suit as to any of the claims alleged, and that therefore, this court lacks jurisdiction. The Defendant also argued that the Plaintiffs claims were barred by the applicable statutes of limitation. Because the court concludes that the Defendant has not waived its immunity from suit in this case, the statute of limitations issue is not addressed.
III.

The Doctrine of Sovereign Immunitg

The Defendant in this case is the authorized agent of the Mohegan Tribe of Indians of Connecticut (“Tribe”), Mohegan Constitution, Art. XIII. The Tribe has received recognition as a tribal entity by the United States pursuant to Part 83 of Title 25 of the Code of Federal Regulations, and it is the successor in interest of the aboriginal entity known as the Mohegan Indian Tribe. 25 U.S.C. § 1775(a)(1) and (2). The Tribe is listed as a recognized entity in 62 Federal Register 55270 (1997). The Defendant is therefore im *596 mune from suit unless “Congress has authorized the suit or the Tribe has waived its immunity.” Kiowa Tribe v. Mfg. Technologies, Inc., 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). “The doctrine of tribal sovereign immunity is rooted in federal common law and reflects the federal Constitution’s treatment of Indian Tribes as governments in the Indian Commerce clause.” Cohen, Federal Indian Law 635 (2005). “Tribal immunity applies to suits for damages as well as those for declaratory and injunctive relief.” Id. at 636. The U.S. Supreme Court has explained that any abrogation of tribal sovereign immunity “cannot be implied but must be unequivocally expressed.” Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). “Indian Nations can waive immunity by tribal law or by contract as long as this is ‘clearly’ done.” Cohen, op. eit., at 642. “A tribe’s waiver must be clear.” C & L Enters. v. Citizen Band of Potawatomi Tribe, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001). Sovereign immunity is jurisdictional in nature, and a Motion to Dismiss is the proper manner of asserting lack of subject matter jurisdiction. Ager v. Office of the Director of Regulation 1 G.D.R. 1, 1 Am. Tribal Law 380, 1997 WL 34678574 (1997). Where there has been no waiver of sovereign immunity, the court is without subject matter jurisdiction, and a Motion to Dismiss must be granted. Id. at 4, 1 Am. Tribal Law at 384-85, 1997 WL 34678574.
The term “waiver” and “abrogation” are sometimes loosely used synonymously, but there is a distinction. “Abrogation” refers to Congressional authorization to sue, i.e., the tribe’s immunity has been “abrogated” by statute. “Waiver” is the tribe’s own act in authorizing suit, ie., it “waives” its immunity. See Cohen, op. cit. Sec. 7.05[1][b] and [c]. This case involves both: whether the Defendant has waived its immunity from suit in Counts One and Two, and whether Congress, in the ICRA, has abrogated the tribe’s immunity from suit in Count Three. The “waiver” and the “abrogation” aspects will be separalelj considered. Because Counts One anc Two are both tort claims founded on alleged negligence, as to which the law regarding sovereign immunity is the same, they will be considered together.
IV.
COUNTS ONE AND TWO: WHETHER THE DEFENDANT HAS WAIVED IMMUNITY
In considering a Motion to Dismiss based on lack of jurisdiction because of sovereign immunity, any claimed waiver must be unequivocally expressed and cannot be implied. Creasey v. Mohegan Tribal Gaming Authority, 2 G.D.R. 26, 27, 4 Am. Tribal Law 570, 2003 WL 25795204 (2003). On the other hand, the Plaintiff has the benefit of certain rules of construction applicable to such motions.
The Defendant’s Motion to Dismiss admits all well pleaded facts, and the Plaintiffs complaint will be construed most favorably to the Plaintiff; e.g., Creasey v. Mohegan Tribal Gaming Authority, 2 G.D.R. 26, 4 Am. Tribal Law 570, 2003 WL 25795204 (2003). Based on this principle, the court will construe the complaint as stating a good cause of action in tort under the Torts Code; i.e., that the Plaintiff suffered an injury caused by a breach of a legal duty which the Defendant owed to the Plaintiff.
The court will also assume that the tori was the editing of the tape, and removal of the twelve minutes from the tape, and/or the deprivation of the Plaintiff’s due pro cess rights with regard to the tape. It is *597 not clear from the pleadings, briefs, and oral argument, as to when the Plaintiffs employment was actually terminated following the revocation of his license. It is also not dear when the editing of the tape occurred. Again, construing the facts favorably to the Plaintiff, the court will assume that the Plaintiff was terminated from his employment upon the revocation of his license, and that the editing of the tape occurred thereafter. That is, the court will assume that the tort was committed after the Plaintiffs employment was terminated.
A.
The Defendant’s first argument in support of its Motion to Dismiss is based on the Mohegan Discriminatory Employment [’radices Ordinance, MTO 2002-04. This provides a limited waiver of sovereign immunity as to certain employment based claims and is the exclusive remedy for any MTGA employee who claims to have been harmed by an adverse MTGA employment act. The Defendant argues that “Plaintiff ignores MTO 2002-04, and makes claims under theories of negligence, quasi-contract, and the Indian Civil Rights Act.” (Defendant’s Brief P. 2.). The Defendant argues that Plaintiffs allegations do not state any claim under MTO 2002-04, but even if they did, they were filed outside the time limits imposed by the ordinance.
More specifically the Defendant argues that “The sovereign immunity of the Mohegan Tribe has not been waived so as to allow the bringing of a wrongful discharge or other employment-related claims except as specifically set forth in MTO 2002-04.” Citing Creasy v. Mohegan Tribal Gaming Authority, 2 G.D.R. 26, 27-28, 4 Am. Tribal Law 570, 2003 WL 25795204 (2003). The Plaintiff readily concedes that he is not asserting any claims under MTO 2002-04. Also, the argument that MTO 2002-04 provides the exclusive remedy for “employment-related claims” somewhat begs the question, to be considered hereafter, whether this is an “employment-related” claim. Therefore, the argument concerning MTO 2002-04 is not persuasive.
B.
The Defendant next argues that Counts One and Two both sound in Tort under the Mohegan Torts Code MTO 2001-07[2].

The Mohegan Torts Code

MTO 2001-07, Sec 5.A. 20 defines a “Tort” as follows:
“20. Tort means an injury to a person caused by a breach of a legal duty to that person, but does not include a breach of a duty imposed by a contract.”
Plaintiffs complaint did not expressly identify this section, but the Defendant concedes, as it must, that the Plaintiffs complaint states a good cause of action under the Torts Code. The Defendant argues, however, that the Defendant is cloaked with the sovereign immunity of the Mohegan Tribe and that the Tribe has not waived its immunity from suit in this case. More specifically, the Defendant argues that the Code expressly precludes the Plaintiffs claim. MTO 2001-07 Sec. 4.E. provides:
“4.E. This Code shall not apply to any claims by employees of the MTGA arising from or out of their employment by the MTGA or from or out of their super *598 vision by MTGA executives, managers, or supervisors. All rights, claims, and remedies of employees of the MTGA are codified elsewhere, and this Code contains no waiver of sovereign immunity by either the Mohegan Tribe or the MTGA so as to permit claims arising from any aspect of the employment relationship between the MTGA and its employees, nor does this Code constitute a consent by the Mohegan Tribe or the MTGA to be sued by any MTGA employee.”
The Defendant argues that the Plaintiffs tort claims arise “from or out of’ his employment by the MTGA, or “from any aspect of’ his employment, and are therefore barred. The Plaintiff, to the contrary argues that his claim is based on the editing of the tape, and that this occurred, (although the dates are not specified) after his license was terminated, and hence after his employment was terminated, and therefore it did not “arise out of” his employment.
In the instant case, the Tribe has clearly waived its immunity from tort suits, but it is just as clear that it made a significant exception in Sec. 4.E. by making the Code inapplicable to claims “arising from or out of,” or “arising from any aspect of the employment relationship.” The key words are “arising out of.” To “arise” is to “spring up” or to “spring forth,” and “arising” therefore means “springing up” or “origination.” Oxford English Dictionary, 629. “Arising out of’ means to “occur as a result of.” Compact Oxford English Dictionary 49. Under Workers’ Compensation Law, the term “arising out of’ is a fundamental term in the law, and is frequently used in conjunction with another important term, “in the course of employment.”
“The words ‘arising out of employment’ refer to the origin of the cause of the injury, while ‘course of employment’ refer to the time, place, and circumstances un der which the injury occurred.” Black’s Law Dictionary.
In the Worker’s Compensation setting the term “arising out of ...” mean.“caused by his employment.” Holden and Daly, Connecticut Evidence, Sec. 57.
The editing of the tape in question wa-done during the Plaintiffs appeal from his license suspension. The tape was of tfo Plaintiff while in the course of his employ ment. While it is apparent to the court that the editing of the tape did not occu1, “in the course of” the Plaintiffs employment, it is also clear to the court that the editing of the tape “sprung up from” oc “originated” in the employment relation ship. It occurred as a result of the employment. It would not have occurred but for the employment.
The Plaintiffs argument that his claim did not “arise out of’ his employment con - Hates two discrete terms: “arising out oft. and “in the course of.” The Plaintiff would have the court conclude that because the tape erasure occurred after hi-termination (that is, it was not “in the course of his employment”) that it therefore did not “arise out of’ his employment.
If the Torts Code excluded tort claims of employees “arising out of and in the, course of their employment,” the Plaintiff-argument wTould be well taken. But the ordinance significantly omits the “in the course of’ term:—it is a significant omission because it is in notable contrast with MTO 2004-04, the Workers’ Compensation Ordinance which reads in part:
“Arising out of and in the course of his employment means an accidental injury happening to an employee or an occupational disease of an employee originating while he has been engaged in the line of his duty in the business or affairs of the *599 employer upon the employer’s premises, or while engaged elsewhere upon the employer’s business or affairs by the direction, express or implied, of the employer, provided: ...” Sec. 4-200.
The contrast is significant: the “arising out of’ term concerns the “originating,” or causal relationship; the “in the course of’ term concerns the “line of duty” relationship. The Workers’ Compensation Ordinance requires both the “originating” or causal relationship, and the “line of duty” relationship. In contrast, the Torts Ordinance excludes claims “arising out of,” or originating in, or causally related to the employment, whether or not they were in the course of employment, or the line of duty; that is, whether or not they occurred during the employment relationship, or after that relationship has been terminated.
In support of his argument that his claim did not arise out of his employment, the Plaintiff cites the decision of the Connecticut Supreme Court in Perodeau v. Hartford, 259 Conn. 729, 792 A.2d 752 (2002).[3]
*600 Perodeau v. Hartford, 259 Conn. 729, 792 A.2d 752 (2002) was a suit by a police officer against fellow employees claiming damages for, inter alia, negligent infliction of emotional distress. In ruling for the Defendants, the Connecticut Supreme Court held that, as a matter of public policy, the court would not recognize a cause of action for negligent infliction of emotional distress without bodily harm, arising out of actions or omissions occurring within the context of a continuing employment relationship, as distinguished from actions or omissions occurring in the termination of employment. As the court said: “We decline to extend that tort so far.” Because that case would allow a tort action for conduct which occurred in the termination process, but not for the same conduct occurring within the context of a continuing employment relationship, the case lends a superficial air of support for the Plaintiffs argument. Perodeau is. however, distinguishable in several important respects. First, it is not a case involving sovereign immunity. The Pero deau suit was against fellow employees, not the City of Hartford, against which the claims had been dismissed. The Perodeau court was considering the public policy question of whether to extend the scope of liability of a common law tort; in the instant case, the quite different issue is whether the Defendant has clearly waived its immunity.
Second, the Perodeau decision was a policy decision not to extend a common law tort—it did not turn on any question of causation dependent upon the term “arising out of.” The origin of the claim in Perodeau was immaterial. It is implicit in the decision that all such claims arose out. *601 of an employment relation. The majority of the Supreme Court decided that it is against public policy in Connecticut to allow such claims where the employment relationship is ongoing. The Perodeau decision was based on the nature of the claim—not on the origin of it. Under Perodeau, other tort claims arising from the employment relationship, even if arising in the context of a continuing employment relationship, will presumably still be allowed. In the instant case, to the contrary, it is not the nature of the claim that results in the immunity, but the origin of it. Under the Mohegan Torts Code any tort claim, regardless of its nature, is barred if it had its origin in the employment relationship, whether before or after termination of the employment.
I It was noted earlier in the opinion that 5 for purposes of deciding the question of f| immunity raised by the Motion to Dismiss, (there is no important distinction between 5 Counts One and Two—they are both tort 4||⅞ claims based on negligence claiming com-ij pensatory monetary damages. For pur-if poses of the question of immunity from ¾ suit, they are identical. For purposes of .as analyzing the applicability of the Perodeau r case, however, there is an important dis-I tinction, which further demonstrates why ⅝ Perodeau is distinguishable.
In Count One, the Plaintiff claims that the tape erasure was a wrong committed by the Defendant that resulted in harm to the Plaintiff by way of the loss of his gaming license, an inability to engage in his profession, loss of wages, and damage to his personal and professional reputation. A claim for emotional distress is only incidental to his claims. Count Two claims only “emotional distress” which “might re-suit in illness or bodily harm.” Complaint, Count Two, Paragraph 13. The Perodeau case concerned only the emotional distress type claim that the Plaintiff has alleged in Count Two. With respect to the type of tort alleged in Count One, it is apparent that the Perodeau court recognizes this type of tort and would allo%r such a claim, even in the context of a continuing employment relationship. The two dissenting Justices agreed with this. That is, because the nature of the tort, and assuming that the Plaintiffs injury was not compen-sable under the Workers’ Compensation action, the Plaintiff would have been entitled to bring a common-law tort action against his employer, even though it arose out of his employment. The origin of the claim is immaterial.
With respect to Count Two, the type of emotional distress claim considered by the Connecticut Supreme Court, a 3-2 majority of the Connecticut Court drew a distinction between claims arising out of actions or omissions occurring within the context of a continuing employment relationship, and those arising out of actions or omissions occurring in the termination of employment. The majority cited “fears of flooding the courts with spurious and fraudulent claims; problems of proof of the damage suffered; exposing potential Defendants to an endless number of claims; and economic burdens on industry,” (see dissenting opinion of Sullivan, C.J.), and concluded that the cause of action for negligent infliction of emotional distress is not cognizable in the context of ongoing employment. For public policy reasons, because of the nature of the claim, the cause of action was not recognized. The origin of the claim is immaterial. The cause of action is not allowable whether or not it arose out of the employment. If the claim arose in the termination process, the majority held that the above-described policy considerations are not applicable, and therefore holds that the cause of action is cognizable, even though it arose out of the employment. The origin of the cause of action is, again, immaterial.
*602 In contrast, the Mohegan Torts Ordinance holds the Tribe immune from all tort claims, whatever their nature, if they arise out of the employment, whether in the context of an ongoing employment, or in the termination process. The nature of the claim is immaterial; it is the origin of the claim that triggers the immunity. Perodeau, accordingly, does not avail the Plaintiff.
The court therefore concludes that the Plaintiffs tort claim for damages, based on the editing of the videotape, arose out of, or sprung up from, or originated in, his employment relationship with the Defendant. Therefore, the Tort Code is not applicable to his claim, and the Defendant has not waived its immunity from suit. Sovereign immunity is jurisdictional in nature; MacLean v. Office of Director of Regulation, 1 G.D.A.P. 20, 21, 5 Am. Tribal Law 272, 275-70, 2004 WL 5659257 (2004); and the Defendant’s Motion to Dismiss must be granted.
V.
COUNT THREE: WHETHER CONGRESS HAS ABROGATED, OR THE TRIBE HAS WAIVED IMMUNITY FOR ICRA CLAIMS
The Plaintiff claims that ICRA authorizes an action in the court to vindicate rights created by ICRA, and that this encompasses a right to such damages for a violation of ICRA. The Plaintiff also cites the Mohegan Constitution Art. XIII, Sec. 4, in support of its claims in Count Three.
The Third Count does not allege a tort claim under the Torts Code. Judge Eagan did not. make any finding whether the editing of the tape was sufficiently prejudicial to invalidate the revocation of the Plaintiffs license. Rather, the court found in LaPlante / that the Plaintiff was denied due process of law in not being given the opportunity to view the edited tape prior to the administrative hearing. The gravamen of the Third Count is that this violation of the ICRA caused an injury to the Plaintiff which the Defendant is liable. The issue before this court is whether the ICRA abrogates, or the Tribe has waived its immunity from suit seeking monetarv damages for this violation.
The ICRA prorides in 25 U.S.C, § 1202 Constitutional Rights:
“No Indian tribe in exercising powers of self-government shall—... (8) deny to any person within its jurisdiction the equal protection of its law—or deprive any person of liberty or property without due process of law.”
The Mohegan Constitution in Art. XI11 Sec. 4 provides:
“Section 4. Indian Civil Rights Act. Nothing in this Article XIII or any other provisions of this Constitution, or any other provision of tribal law shall foreclose or limit any right any person ma.. otherwise have to bring an action in a court of competent jurisdiction to protect a right or seek a remedy otherwise available pursuant to the Indian Civil Rights Act, 25 U.S.C. § 1301 et seq."
The U.S. Supreme Court in Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), held that ICRA had not limited the tribes’ immunity from suit, so ICRA cannot be enforced directly against tribes. Id, at 58-59, 98 S.Ct. 1670. ICRA is primarily enforceable in tribal forums; id. at 65, 98 S.Ct. 1670; but “Enforcement depends on tribal waivers of sovereign immunity for purposes of these claims.” Cohen, Federal Indian Law, 955, N. 459
It is certainly the case, as the Plaintiff claims, that “tribal forums are available t,o vindicate rights created by ICRA and Se:’ tion 1302 has the substantial and intended *603 effect of changing the law which these forums are bound to apply.” Santa Clara Pueblo v. Martinez, at 65, 98 S.Ct. 1670. This court was available to the Plaintiff in LaPlante / and his lights to due process of law were vindicated therein. As a result of the judgment of this court his license ".-.was reinstated. The Plaintiff now makes claims beyond this vindication of his rights, and further seeks monetary damages. He does not, however, identify any express waiver or abrogation of immunity from such claim.
Plaintiff emphasizes the language in the Mohegan Constitution granting him a right to “seek a remedy” in this court; but immediately following the quoted words, the Constitution states “otherwise available,” i.e., the remedy that the Plaintiff may seek is a remedy that must be available otherwise than under the ICRA. No such remedy is otherwise available to the Plaintiff in this case.
The Gaming Disputes Court of Appeals has affirmed that the adoption of ICRA by the Mohegan Tribe does not create a waiver of sovereign immunity against a claim of damages. Bartha v. Mohegan Tribal Gaming Authority, 1 G.D.A.P. 34, 37, 6 Am. Tribal Law 480, 484-86, 2005 WL 6237210 (2005). Quoted with approval a previous decision of this court in Worthen v. Mohegan Tribal Gaming Authority, 1 G.D.R. 90, 93-94 (2003):
"It is clear, and the Gaming Disputes Court has always held, that the Mohegan Tribe possesses all inherent sovereign rights and powers of an independent, indigenous sovereign nation. As such, the Mohegan Tribe, the Mohegan Tribal Gaming Authority, and the Tribe’s other enterprises or political subdivisions possess the “common-law immunity from suit traditionally enjoyed by sovereign powers”, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978), absent “a clear waiver [of immunity] by the Tribe or congressional abrogation.” Ager v. Office of the Director of Regulation, 1 G.D.R. 1, 2, 1 Am. Tribal Law 380, 382-82, 1997 WL 34678,574 (1997), quoting Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).”
“This Court has long recognized that any waiver of sovereign immunity by the Mohegan Tribe or the MTGA must come from a clear, unequivocal waiver of immunity or congressional abrogation. Long v. Mohegan Tribal Gaming Authority, et al, 1 G.D.R. 5, 11, 1 Am. Tribal Law 385, 395-96, 1997 WL 34678573 (1997). Neither is present in this case. The adoption of the provisions of the Indian Civil Rights Act by the Mohegan Tribe in its Constitution does not create a waiver of sovereign immunity against a claim for damages. (“ ‘[T]he feet that a statute applies to Indian tribes does not mean that Congress abrogated tribal immunity in adopting it.’ ” Garcia v. Akwesasne Housing Authority, et al., 268 F.3d 76, 86 n. 5, (2d Cir.2001), quoting Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 357 (2d Cir.2000)). The United States Court of Appeals for the Ninth Circuit has found no support for the proposition that a tribe’s incorporation of the Indian Civil Rights Act into its constitution shows an intent to waive sovereign immunity (albeit in a federal forum). Demontiney d/b/a v. United States, et al., 255 F.3d 801, 814 (9th Cir.2001).” 1 G.D.R. 93-94
In support of its ICRA claim, the Plaintiff relies on decisions of several other Tribal Courts. Works v. Fallon-Paiute Shoshone Tribe, 24 ILR 6078 (Inter-Tr. CT App. Nev.1997) is an interesting case. The court began its decision by stating *604 that “This court does not have before it the complaint filed in the Tribal Court. We therefore, do not know the exact nature of the appellant’s factual arguments. We know in general that appellant alleges that civil rights guaranteed him under the Indian Civil Rights Act were-violated by actions of the Fallon Paiute—Shoshone Tribe and others. He claims the right to some unspecified type of relief if he is able to prove his case at trial.” The court held, (in this somewhat unusual situation for an appellate court,) “that because one of the paramount purposes of the Indian Civil Rights Act is to assure that Indians are accorded protection of their civil rights and due process of law in their tribal relationships, tribal immunity is waived for the purpose of permitting an inquiry by the tribal court into whether rights set out in the ICRA have been violated. As this court stated previously, to hold otherwise, would leave us with a right, the breach or denial of which, is without a remedy.” The Works court did not hold that ICRA abrogated tribal immunity from suits for damages. Rather, the court held only that the Plaintiff “may seek remedies which he believes the Indian Civil Rights Act entitles him to. The tribal court’s determination on the question of remedies shall rest solely on the mandates of the Indian Civil Rights Act.” Id. at 6079.
This court agrees with the Works court that ICRA “itself is a waiver of the immunity of the Tribe for the narrow purpose of vindicating rights guaranteed by the Act and ordering an appropriate remedy.” Ibid. That remedy, however, must be within whatever waivers of sovereign immunity are applicable to the facts of the case in question. In the instant case, the applicable waiver was the right of appeal from the order revoking the Plaintiffs gaming license, and the appropriate remedy has already been ordered by this court, to wit, the sustaining of the Plaintiffs appeal and the reversal of the license termination ordered by Judge Eagan.
The Plaintiff also relied on two Mashantucket Court cases. Johnson v. M.P.G.E., 1 MPR 15, 1 Mash.App. 21 (1996) held that applicable law conferred a property interest in the Plaintiffs employment with Mashantucket Gaming Enterprise. In view of the decision reached in the instant case, the property interest question is not before the court in this case.
Healy v. M.P.G.E., 1 MPR (⅝ 2 Mash. App. 28 (1999) is consonant with the decision reached In this case. There, Judge Zampano considered the question whether the Mashantucket Pequot Tribal Nation has waived sovereign immunity from liability with respect to the Plaintiffs due process and equal protection claims under ICRA. The court first noted that the issue of jurisdiction of the Tribal Court is separate and distinct from the issue of sovereign immunity: “Thus, although we interpret the grant of jurisdiction of the Tribal Court broadly, we construe waivers of liability by the Tribal Council narrowly.” The Healy case involved a claim of a tribal employee that his due process lights under the ICRA were violated by the Defendant’s denying him a Board of Review hearing regarding his termination of employment. The court held that the trial court had jurisdiction to hear the Plaintiffs claims and to adjudicate the Plaintiffs claims that he was denied ICRA rights, without regard to the merits of his alleged wrongful discharge. The Court noted that “the Tribal Court’s exercise of jurisdiction involves no impermissible intrusion on the Tribe’s sovereign immunity.” Further, “On remand, even assuming Appellant prevails, the result merely grants him access to an administrative process wrongfully denied him under ICRA by the Gaming Enterprise.” In short, the court in Healy held that the *605 Plaintiff there was entitled to exactly that which the Plaintiff here already received, i.e., a hearing adjudicating the Plaintiffs claims that he was denied ICRA rights. The Healy court expressly did not rule as to what remedies, if any, the Plaintiff in Healy might be entitled to. The Healy court did not hold that ICRA abrogated any tribal immunity from civil actions for damages. The Plaintiff here has obtained all that which the Healy court ordered, and more. The Plaintiff here not only obtained the hearing at issue in Healy, but he also obtained a reversal of the license termination, a remedy which vindicated his ICRA rights.
The court therefore concludes that the Defendant has not waived, nor has Congress abrogated, its immunity from suit with respect to the Plaintiffs claims in Count Three.
VI.

CONCLUSION

For the foregoing reasons the Court concludes that the Defendant is immune from suit for the causes of action alleged in the Complaint; that the Congress has not abrogated, nor has the Defendant waived, its immunity; that the Court therefore lacks subject matter jurisdiction over the claims; and that the Defendant’s Motion Id Dismiss must be, and it hereby is, granted. The action is dismissed.

. Although it is entitled "Indian Civil Rights Act,” and although it is sometimes said that one of its purposes is to "assure that Indians are accorded protection of their civil rights and due process of law in their tribal relationships”; Works v. Fallon Paiute—Shoshone Tribe, 24 ILR 6078 (1997); it is dear that non-Indians are entitled to the protection of ICRA. Dodge v. Nakai, 298 F.Supp. 26 (D.Ariz.1969.)

. Although the Defendant initially based its I claim of sovereign immunity on the current Torts Code, MTO 2005-02, that Code was not ⅜ in effect at the time (or times) that the cause of action arose in this case, . Therefore, all references to the Torts Code are to MTO 2001-07.

. The decision of the Connecticut Supreme Court in Perodeau v. Hartford, 259 Conn. 729, 792 A.2d 752 (2002) is a purely common law decision, i.e., it is not a decision interpreting the Connecticut General Statutes, or the "positive law,” as MTO 95-4, Sec. 301(b) refers to it. Chief Judge Guernsey noted the distinction in Drysdale v. MTGA, 2 G.D.R. 17, 18 n. 5, 4 Am. Tribal Law 562, 2003 WL 25795206 (2003):
“:> It has been generally assumed that under MTO 95-4 Section 300(b) Connecticut common law, except to the extent that it conflicts with Mohegan Tribal Law, is one of the sources of Tribal Laws The actual language of the ordinance, however, appears to refer only to Connecticut decisional law interpreting the Connecticut General Statutes, rather than to Connecticut common law. The difference is illustrated in the Craig v. Driscoll decision, which, inter alia, found that the common law negligence cause of action newly recognized did not conflict with Conn. Gen.Stat. § 31-102. It is doubtful that the ordinance intended that the Gaming Disputes Court distinguish between common law and decisional law interpreting the General Statutes, and apply only the latter, given the interrelationship of the two both under Connecticut law and Mohegan law (for example, the recognition of common law torts in the revised Mohegan Torts Code, MTO 2001-07).”
Article III of MTO 95-4 provides as follows:
“Section 300—Substantive Law. The judges of the Gaming Disputes Trial Court and the Gaming Disputes Court of Appeals shall apply and enforce the substantive law of the Mohegan Tribe in all cases, except when Tribal law is preempted by applicable federal law.
Section 301—Sources of Tribal Law. The substantive law of the Mohegan Tribe for application by the Gaming Disputes Court shall be:
(a) The law as set forth in any Mohegan Tribal ordinances or regulations.
(b) The General Statutes of Connecticut, as may be amended from time to time, are hereby adopted as and declared to be the positive law of the Mohegan Tribe for application by the Gaming Disputes Court, except as such statutes are in conflict with Mohegan Tribal Law.
(c) The common law of the State of Connecticut interpreting the positive law adopted in section 301(b), above, which body of law is hereby adopted as and declared to be the common law of the Mohegan Tribe for application by the Gaming Disputes Court, except as such common law is in conflict with Mohegan Tribal Law.
Section 302^—Traditional. Tribal Law. Unwritten Mohegan Tribe traditional law and customs shall not be applicable to any civil action or appeal in the Gaming Disputes Court, and no evidence offered to prove nor argument predicated upon any such traditional law or custom shall be admissible or accepted in the Gaming Disputes Court. Section 303—Authority to Further Develop Mohegan Tribe Common Law. The Gaming Disputes Trial Court and Gaming Disputes Court of Appeals shall have the authority to further develop through their decisions the Mohegan Tribe common law for the Gaming Disputes Court on any question of law. *600 In further developing the Tribe’s common law and in deciding the cases before it, the Gaming Disputes Court shall strive to achieve stability, clarity, equity, commercial reasonableness, and fidelity to any applicable Mohegan Tribal ordinances or regulations.”
As a general proposition the term “common law” is distinguished from law created by the enactment of legislatures, and “comprises the body of those principles and rules of action, relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming, and enforcing such usages and customs.” Black's Law Dictionary, 345-6. In this respect it is distinguished from "positive law,” which may be defined, in this context, as "law actually and specifically enacted or adopted by proper authority for the government of an organized jural society," Id. at 1324. Returning to MTO 95-4, then, Section 301(b) makes clear that the General Statutes of Connecticut are “positive laws” for the Mohegan Tribe and must be applied by this court, except when pre-empted by federal law. Sec. 301(c) then states that “the common law of the State of Connecticut interpreting the positive law adopted in Section 301(b)," also must be applied by this court "except as such com mon law is in conflict with Mohegan Triba Law." (Emphasis added.) The Ordinaria does not address the applicability of "pure" Connecticut common law, i.e., as distin guished from decisions of the Connecticut courts interpreting the Connecticut General Statutes. Although, as noted by Chief Judgi Guernsey, supra, “it is doubtful that the ordi nance intended” that this court make this distinction, the ordinance goes on to provide in Sec. 303 that this court has the ‘authority to further develop ... common law ... on any question of law.’ ”
Reading Perodeau in this light, therefore, the court considers the Perodeau decision as an important authority, but not necessarily as a binding precedent. In this regard, it may also be noted that Perodeau was a 3-2 deci sion of the Supreme Court, with two dissent ing opinions: Chief Justice Sullivan apparent ly would prefer not to allow any claims for emotional distress where there is no resulting bodily injury; but that if any such claims are allowed, the Chief Justice would not foreclose such claims merely because they occurred in the context of an ongoing employment rela tionship. Justice Norcott concurred with the Chief Justice on this latter point, and there fore also dissented.